## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SIMON V. KINSELLA | : | |
| *Plaintiff,* | :<br>:<br>: | Case: 1:22–cv–02147<br>Assigned To : Cobb, Jia M.<br>Assign. Date : 7/20/2022 |
| v. | : | Description: FOIA/Privacy Act (I–DECK) |
| | : | |
| BUREAU OF OCEAN ENERGY MANAGEMENT; | : | Civil Action No.: _____ |
| DEB HAALAND, Secretary of the Interior, | : | |
| U.S. DEPARTMENT OF THE INTERIOR; | : | Re Document No.: _____ |
| MICHAEL S. REGAN, Administrator, U.S. | : | |
| ENVIRONMENTAL PROTECTION AGENCY; | : | |
| | : | COMPLAINT FOR DECLARATORY |
| *Defendants,* | : | AND INJUNCTIVE RELIEF |
| | : | |
| | : | |
| SOUTH FORK WIND LLC; | : | |
| LONG ISLAND POWER AUTHORITY; | : | |
| | : | |
| *Nominal Joinder Parties* | : | |

# I.   INTRODUCTION

The White House said on June 15, 2022, "that every American deserves to drink clean water. But for too many communities across this country, children and families are drinking water that is contaminated with […] dangerous chemicals."  The Administration announced "new findings and actions that will help to protect Americans' drinking water from contamination, including from "forever chemicals" like per- and polyfluoroalkyl substances ["PFAS"].  PFAS […] can cause cancer and other severe health problems […] [and] are considered "forever chemicals" because they are environmentally persistent, bioaccumulative, and remain in human bodies for a long time."  The President's announcement included the EPA's "*interim* updated drinking water lifetime health advisories for perfluorooctanoic acid ["PFOA'] and perfluorooctane sulfonic acid ["PFOS"] that replace those issued by EPA in 2016.

The updated advisory levels are based on new science that indicates that some negative health effects may occur with concentrations of PFOA or PFOS in water that are near zero [...]." See www.whitehouse.gov/briefing-room/statements-releases/2022/06/15/fact-sheet-biden-harris-administration-combatting-pfas-pollution-to-safeguard-clean-drinking-water-for-all-americans/

The U.S. Department of the Interior's Bureau of Ocean Energy Management ("**BOEM**") did *not* share the U.S. President's concerns when it approved an onshore transmission cable route for an offshore wind farm, collectively known as the "South Fork Wind Project."  After receiving BOEM's approval to proceed with construction, the developer began excavating over 30,000 tons of soil (and groundwater) in February 2022.  The developer, South Fork Wind LLC (formerly Deepater Wind South Fork LLC), knew of the PFAS contamination at least as early as 2019.  Still, without regard to safety, it rushed to excavate contaminated soil and groundwater from a square mile with more PFAS-contaminated private drinking water wells than anywhere else on Long Island.

BOEM received overwhelming evidence of extensive PFAS contamination exceeding U.S. Environmental Protection Agency ("EPA") 2016 Health Advisory Levels ("2016 HAL") nine months *before* it issued its record of decision ("ROD") (on November 24, 2021).  BOEM is statutorily mandated to take a "hard look" into environmental impacts according to the National Environmental Protection Act and the Outercontinental Shelf Lands Act.  However, BOEM looked away, recklessly concluding that—  "Overall, existing groundwater quality in the analysis area appears to be good" (see FEIS at p. H-23, PDF p. 655 of 1,317).  PFAS contamination continues to adversely impact our sole-source aquifer that thousands of residents rely on as their only source of fresh water, including private drinking water wells and public supply wells operated by the Suffolk County Water Authority.  South Fork Wind's construction activities,

concrete duct banks, and large underground vaults the size of forty-foot shipping containers will exacerbate, enhance, spread, and prolong PFAS contamination for decades and pose a threat to our drinking water supply.

—————————————————————

In addition to turning a blind eye to adverse environmental impacts, BOEM abdicated responsibility as the lead agency by heedlessly relying on demonstrably false presumptions to justify fabricated purposes and needs.  In each instance, BOEM received at least nine months *before* issuing its ROD substantial evidence sufficient to sustain the burden of proof required to rebut the presumptions of regularity and, in some instances, the validity thereof.

BOEM (falsely) asserts that the Project it approved was "designed to contribute" to New York State's Climate Leadership and Community Protection Act enacted *three-and-a-half years after* South Fork Wind designed the project; and even when assuming *arguendo* the Act was applicable (it is not), the Project would have failed to satisfy the statute's requirements.

BOEM asserts that the Project's goal is to fulfill "contractual commitments" that it neither identifies nor discusses, according to a "power purchase agreement" that defines *only* one "goal"— to exclude minorities, women, and service-disabled veterans who own businesses from participating in the project.

Furthermore, BOEM (falsely) asserts that the power purchase agreement resulted from a "technology-neutral competitive bidding process," ignoring clear substantial evidence to the contrary that it had received nine months *before* approving the project.

BOEM alleges that its "action is needed to further the United States' policy to make OCS energy resources available for […] development, subject to environmental safeguards[,] [in a manner which is consistent with the maintenance of competition] (43 U.S.C. § 1332(3)),

including consideration of natural resources" (ROD, at p. 7, PDF p. 9, ¶ 8). On the contrary, BOEM ignored environmental safeguards regarding PFAS contamination and approved a project born from a rigged, non-competitive procurement process that resulted in a contract award at above-market rates.

According to NEPA, BOEM must "specify the underlying purpose and need to which the agency is responding in proposing the alternatives" (40 C.F.R. § 1502.13). Therefore, BOEM must measure and assess alternatives against those underlying purposes and needs. Instead, BOEM relied upon a fabricated purpose and needs statement to justify approving the project, thereby corrupting the integrity of the NEPA review process. It is impossible for BOEM to "[r]igorously explore and objectively evaluate all reasonable alternatives" in response to undefined and false purposes and needs (NEPA, 40 C.F.R. § 1502.14). If "[t]his is the heart of the environmental impact statement" (*Ibid*), then the project is in cardiac arrest.

_____

Long Island is a peninsula with hundreds of alternative beaches and other possible landing sites. Regardless, BOEM approved the *only* landing site and cable route to run through a square mile with more private drinking water wells containing PFAS contamination than anywhere else in Suffolk County. BOEM permitted South Fork Wind to build underground transmission infrastructure for high-voltage cables in a residential neighborhood and within two Critical Environmental Areas designed to protect the safety of the sole-source aquifer (the Special Groundwater Protection Area (South Fork) and the Water Recharge Overlay District).

Furthermore, BOEM ignored a superior alternative that would have avoided the severe environmental contamination and satisfied all the purposes and needs in its Environmental Impact Statement at less than half the price.

BOEM received comments, supporting documentation, and proof that by combining the South Fork Wind Project with the Sunrise Wind Project (the "**Sunrise Alternative**"), the interconnected project would be technically, environmentally, and economically superior.

Instead, BOEM (falsely) asserts that— "No other cable landing site alternatives were identified during Project development or scoping […] (see New York Article VII submitted by SFW)" (FEIS, p. 2-19, PDF p. 45, final ¶). Contrary to BOEM's allegation, the Sunrise Alternative *was* identified and discussed during the project's development, scoping, *and* during the New York State Public Service Commission proceeding to which BOEM refers. The Commission's final ruling identifies the Sunrise/South Fork alternative *eight times*.

BOEM relied on false presumptions of regularity from non-cooperating state agencies in the face of clear substantial evidence rebutting those presumptions, failed to examine relevant information, including onshore contamination, and did not articulate a satisfactory explanation for its decision. The glaring deficiencies in BOEM's review are insurmountable fatal flaws that undermine the integrity of BOEM's entire NEPA review.

———————————————

According to the FEIS, the Project will have a beneficial economic impact. The economic analysis includes estimates of the project's capital expenditures and yearly operational expenditures depending upon the final capacity of the offshore wind farm. Given that the final capacity is one hundred and thirty megawatts (130 MW), South Fork Wind's estimated amount of money it will inject into the economy, the total beneficial economic impact, is approximately $390 million over twenty years (using simple arithmetics). Still, the analysis is lopsided.

South Fork Wind's economic analysis considers only the money it will spend in building and operating the project, but it fails to consider the money it will be charging the utility for its

energy that the Long Island Power Authority then passed on to ratepayers.  This money will be taken out of the economy and represents an *adverse* economic impact.  LIPA estimates the total project cost to be $2.013 billion (over the twenty-year contract term).  The net economic impact is approximately *negative* $1.623 billion.  In other words, the South Fork Wind project will have a net adverse economic impact of $1.6 billion (over its twenty-year life).

Although BOEM alleges that "the Proposed Project could have […] beneficial impacts on […] employment, and economics" (ROD at p. D-8, PDF 100, ¶ 1), its claim is undermined by the fact that for every dollar the developer puts into the economy, it is withdrawing more than four times that out of the economy.  Moreover, the adverse economic impact falls disproportionally on lower-income families, contravening executive orders on environmental justice.

--------------------------------

This action seeking declaratory and injunctive relief challenges the failures of BOEM, an agency within the U.S. Department of the Interior, to comply with the National Environmental Policy Act, 42. U.S.C. §§ 4321, *et seq.* (regulations of 1978, as amended in 1986 and 2005, prior to the revised regulations issued by the CEQ on July 16, 2020) ("**NEPA**"); and the Outer Continental Shelf Lands Act, 43. U.S.C. §§ 1331, *et seq.* ("**OCSLA**"); when assessing, disclosing, and mitigating the environmental effects of its decision to approve an offshore wind facility and necessary onshore transmission system filed by South Fork Wind LLC (formerly Deepwater Wind South Fork LLC, the "**Applicant**," "**South Fork Wind**," or "**SFW**").

--------------------------------

## II.   JURISDICTION AND VENUE

1.     This Court has original subject matter jurisdiction under 28 U.S.C. §§ 1331.  This is a

civil action pursuant to 42 U.S. Code § 6972(a)(1)(A).  The civil action arises from claims under

Federal Law, including the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 through

706; NEPA (regulations of 1978, as amended in 1986 and 2005), the OCSLA, 43 U.S.C. §

337(p)(4)(B).

2.      This Court has authority to grant the relief requested herein pursuant to the APA, 5

U.S.C. § 706 (2); and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

3.      The venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(A), where Defendants are

agencies of the United States that reside in this judicial district.

4.      A reasonable connection to the forum exists, and the venue is proper, will promote

objectivity, and lead to a just decision based on the merits.

---

## III.   PARTIES

5.      I, <u>Simon V. Kinsella, plaintiff *pro se*</u>, am a full-time resident of Wainscott, in the Town

of East Hampton, Suffolk County, New York –

   a.   I live near the beach where the Applicant plans to bring a high-voltage submarine

        cable ashore and install underground transmission infrastructure through my

        neighborhood;

   b.   I am a taxpayer and a ratepayer in the service area who will have to pay higher rates

        for power because BOEM approved a project contrary to its statutorily mandated

        obligations;

   c.   In 2017, my community asked me to investigate a proposal for an offshore wind farm

        sponsored by the Applicant following a request (in 2016) that I look into water

quality issues in Wainscott, including a group of emerging contaminants known collectively as per- and polyfluoroalkyl substances ("**PFAS**").

    d.  I have contributed substantially to BOEM's record of review, including testimony (of 299 pages), briefs (of 46 pages), and provided approximately one hundred and fifty (150) exhibits.

6.     I relied on BOEM to conduct a vigorous and wholehearted review "to the fullest extent possible" (NEPA 1978, 42 USC § 4332, sect. 102), but BOEM recklessly ignored its obligations.

7.     <u>I have standing to bring this action</u> –

    a.  Had the defendants conducted a thorough review, my daily routine and the pleasures I enjoy with my family would not have been put on hold for years.  Since 2016, I have been fighting for clean water that BOEM threatens by its action to approve the South Fork Wind Project's onshore construction.  It has taken its toll and adversely impacted my family and me.

    b.  Having high-voltage electric cables within feet of where I used to jog and enjoy walking to the local farm stand and socializing with neighbors will forever be tainted with the adverse health effects of (I) concrete duct banks and vaults, prolonging and exacerbating existing PFAS contamination of soil, groundwater, and surface waters of Georgica Pond and Wainscott Pond; (II) electromagnetic radiation; and (III) thermal effects.

    c.  I used to enjoy Georgica Pond when sailing at least three days a week (weather permitting), swimming, and eating fresh fish and crabs caught from the pond.  Due to irreparable damage from construction that BOEM improperly allowed, I can no longer enjoy our local environment.

d.  One of my greatest pleasures used to be jogging to the beach along Beach Lane with my husband.  I am no longer safe doing so with any regularity due to underground high-voltage transmission infrastructure and cables buried just a few feet below the surface.  The standards used to assess the EMF effects date to 1978 and 1992.  It is as if science stood still for 30 years.

e.  South Fork Wind's chosen landing site/cable route is nestled between two glacial ponds, Georgica Pond and Wainscott Pond, separated by only 2,300 feet.  It is a magnificent environment teeming with marine life and birds and a reason why I moved to Wainscott full-time in 2008.  BOEM ignored its mandate to protect such a beautiful and delicate environment.

f.  Since BOEM approved the project, South Fork Wind has taken from my family and me the simple pleasures we used to enjoy.  We live in a toxic environment where we are rarely told the truth by those who are duty-bound to protect us and our environment but have failed to do so.

g.  Due to the defendants' statutory violations, South Fork Wind has and will continue to cause irreparable damage to our environment, our property will be less valuable, and our utility rates will be higher.

8.  DEFENDANTS, U.S. Department of the Interior, and the Honorable Deb Haaland, in her official capacity as Secretary of the Interior (collectively "**DOI**"), is an "agency" within the meaning of the APA, 5 U.S.C. § 701(b)(1).  Through its Secretary, DOI has the authority and duty to comply with NEPA, 42 U.S.C. § 4332(2)(C), and with OCSLA, 43 U.S.C. § 1337(p)(4)(B).

9.  DEFENDANT, the U.S. Bureau of Ocean Energy Management ("**BOEM**") is a

component of DOI and an "agency" within the meaning of the APA, 5 U.S.C. § 701(b)(1).
Exercising authority delegated from USDOI, BOEM took the final agency actions challenged
herein.

10.     DEFENDANTS, the U.S. Environmental Protection Agency and the Honorable Michael
S. Regan, in his official capacity as Administrator of the U.S. Environmental Protection Agency
(collectively "**EPA**") is an "agency" within the meaning of the APA, 5 U.S.C. § 701(b)(1).
Through its Secretary, EPA has the authority and duty to comply with NEPA (42 U.S.C. 4321 *et
seq.*) and its implementing regulations.

_____

# IV.   THE PROJECT

11.     The proposed South Fork Wind Project comprises an offshore wind farm with a
nameplate capacity of 130 megawatts ("**130 MW**"), its transmission cable(s), and related
infrastructure that includes an onshore interconnection facility (herein collectively referred to as
the "**Project**").

12.     The offshore wind farm component of the Project will be located approximately thirty-
five miles east of Montauk Point, New York, in the Atlantic Ocean on the Outer Continental
Shelf in BOEM Renewable Energy Lease Number OCS-A 0517.

13.     The total length of the proposed new transmission line is approximately sixty-six (66)
miles, of which approximately sixty-two (62) miles will be offshore and approximately four (4)
miles onshore.

14.     Onshore, South Fork Wind plans to install underground transmission infrastructure for
high-voltage cables through the seaside residential neighborhood of Wainscott, and an
interconnection facility" (i.e., a substation with transformers, *et cetera*).

15.     South Fork Wind plans indicate that it will excavate over 30,000 tons of material (including soil and groundwater) from its onshore construction corridor and interconnection facility.

16.     The onshore section of the proposed high-voltage transmission system includes the underground installation of ten large vaults with concrete duct banks between each.

17.     Nine vaults are for splicing (~ 26 ft long by 12 ft wide by 12 ft deep each) and one transition joint vault (~ 48 ft long by 10 ft wide by 12 ft deep).

18.     The plans allow for approximately two miles of duct banks (~ 4 ft wide by 5 ft deep for 2 miles, non-contiguous).

19.     The proposed onshore construction corridor runs immediately above and, at some locations, encroaches into an aquifer system used for drinking water that the US Environmental Protection Agency designated a Sole-Source Aquifer in 1978.

20.     The aquifer system provides one hundred percent (100%) of the drinking water consumed on the South Fork (excluding bottled water).  No alternative drinking water source could physically, legally, and economically supply all those who depend on it for drinking water and all other freshwater needs.

21.     Suffolk County Water Authority ("**SCWA**") supplies public water to connected homes.

22.     SCWA draws freshwater from the aquifer system using public supply wells.

23.     SCWA operates six public supply wells within one mile of the proposed onshore construction corridor.

24.     The onshore section of the construction corridor for the proposed high-voltage transmission cables and underground infrastructure runs through two Critical Environmental Areas designed to protect the safety of the aquifer: (i) the Special Groundwater Protection Area

(South Fork); and (ii) the Water Recharge Overlay District.

25.    Before 2018, approximately ninety percent of residents living in Wainscott used private wells for all their freshwater needs, including drinking water.  My family and I, among others, still use private wells.

26.    Many farmers in Wainscott irrigate their crops using private well-water.

27.    The proposed (underground) construction corridor is downgradient and adjacent to the East Hampton Airport site that includes an industrial park (collectively "**Airport**").

28.    The New York State Department of Environmental Conservation ("**NYSDEC**") registered the Airport with the State Superfund Program (site codes 152250 and 152156).

29.    South Fork Wind's construction corridor shares a common border with the Airport of more than one thousand feet long (1,000 ft).

30.    South Fork Wind's construction corridor is adjacent and downgradient from the Airport, a known source of PFAS contamination of soil and groundwater.

31.    PFAS contamination concentration levels at the site exceed Federal and State standards.

32.    Such contamination exists within five hundred feet of South Fork Wind's (underground) construction corridor.

33.    South Fork Wind's construction corridor is adjacent (for approximately 3,000 feet) and upgradient from a former sand-mining operation registered with NYSDEC State Superfund Program (as Wainscott Sand and Gravel, code 152254).

34.    PFAS contamination in groundwater south of the Airport (in Wainscott, NY) is pervasive.

35.    In 2017 and 2018, the Suffolk County Department of Health Services ("**SCDHS**") tested over three hundred (300) private drinking water wells in Wainscott downgradient from the

Airport in the same area where South Fork Wind is currently installing its underground high-voltage transmission infrastructure.

36.     In June 2018, SCDHS reported receiving three hundred and three (303) test results for PFAS contamination of private wells in Wainscott.  Of those wells, one hundred and fifty-nine wells (52%) showed detectible levels of perfluorooctane sulfonate ("**PFOS**") and perfluorooctanoic acid ("**PFOA**") contamination.

37.     The average (combined) concentration level of PFOS/PFOA contamination detected in the private drinking water wells tested by SCDHS up to mid-June 2018 is twenty-three parts per trillion (23 ppt).

38.     The maximum contamination level of PFOS/PFOA contamination detected in the private drinking water wells tested by SCDHS up to mid-June 2018 is seven hundred and ninety-one parts per trillion (791 ppt).

39.     Thirteen (13) wells tested by SCDHS up to mid-June 2018 exceeded the 2016 EPA Health Advisory Level of seventy parts per trillion (70 ppt).

--------

## V.     NOTICE OF DEFICIENCIES

40.     In November 2018, BOEM received comments from me ("**2018 Comments**") in response to South Fork Wind's Construction and Operations Plan ("**COP**"). See Exhibit A- 2018 Comments.  BOEM posted the comments-letter online that is herein incorporated by reference and available at – www.regulations.gov/comment/BOEM-2018-0010-0074.

41.     On February 16, 2021, I gave oral testimony during BOEM's Public Hearing #3 ("**Oral Testimony**") that is herein incorporated by reference and available at – https://downloads.regulations.gov/BOEM-2020-0066-0380/attachment_1.pdf (transcript time-

stamp beginning at 1:18:08).

42.     In February 2021, BOEM received further comments from me ("**2021 Comments**") in response to the Draft Environmental Impact Statement ("**DEIS**").  See Exhibit B- 2021 Comments.

43.     My 2021 Comments provide clear substantial evidence, including testimony, briefs, and over one hundred and fifty exhibits showing the many assertions upon which BOEM relied were not based in fact.  See Exhibit C – BOEM Index of Documents.  All the documents listed in Exhibit C are herein incorporated by reference and are available at the following links maintained by BOEM—

> https://www.regulations.gov/comment/BOEM-2020-0066-0343
>
> https://www.regulations.gov/comment/BOEM-2020-0066-0384
>
> https://www.regulations.gov/comment/BOEM-2020-0066-0385

44.     BOEM made little attempt to address the substantive material deficiencies raised in my 2021 Comments.

45.     In December 2021, BOEM (along with other Federal, State, and local agencies and South Fork Wind) received sixty days' notice of intent to sue (Exhibit D- Sixty Days' Notice of Intent to Sue.

46.     In March 2022, BOEM (along with other Federal, State, and local agencies and South Fork Wind) received further letter-testimony concerning South Fork Wind's flawed testing of soil and groundwater for PFAS contamination (Exhibit E- 2022 Comments).

47.     BOEM did *not* contact me to discuss my 2018 Comments, 2021 Oral Testimony, or my 2021 Comments.

[left blank]

# VI.   PFAS CONTAMINATION

<u>Notice of PFAS Received by BOEM</u>

48.    In February 2021, BOEM received comments including over one hundred and fifty exhibits providing substantive evidence of PFAS contamination surrounding South Fork Wind's proposed onshore construction corridor through Wainscott.  The main exhibits on PFAS contamination are listed below (NB: all <u>Exhibit #000</u> are linked to the source documents that BOEM uploaded to its website) –

PFAS Contamination Heat Map of Onshore Cable Route (1 page) .............. <u>Exhibit #005</u>

PFAS Zone - onshore cable route decided *after* PFAS detection (1 page) ..... <u>Exhibit #006</u>

PFAS Contamination of Onshore Corridor (satellite map) (2 pages) ............ <u>Exhibit #004</u>

PFAS release within 500 feet of SFEC route (surface runoff) (2 pages) ........ <u>Exhibit #007</u>

Testimony 1-1, PFAS Contamination, Kinsella (Sep 9, 2020)(37 pages) ...... <u>Exhibit #061</u>

- Exhibit C - Report No 3 - PFAS Contamination (91 pages) .............. <u>Exhibit #065</u>

Testimony 1-2 - PFAS Contamination, Kinsella (Oct 9, 2020)(11 pages) ...... <u>Exhibit #094</u>

Testimony, Rebuttal (Oct 30, 2020)(13 pages) .................................. <u>Exhibit #162</u>

Initial Brief by Simon V. Kinsella (Jan 20, 2021)(34 pages) ................... <u>Exhibit #009</u>

Reply Brief & Exhibits by Simon V. Kinsella (Feb 3, 2021)(29 pages) ......... <u>Exhibit #011</u>

Motion to Reopen Record by Simon V. Kinsella (Jan 13, 2021)(21 pages) .... <u>Exhibit #022</u>

49.    BOEM knew of the nature and extent of PFAS contamination and the degree to which such contamination exceeded EPA and applicable New York State regulatory standards at least nine months *before* it issued its ROD approving the Project.

50.    BOEM asserted in its FEIS that "[o]verall, existing groundwater quality in the analysis area appears to be good" (see FEIS at p. H-23, PDF p. 655 of 1,317).

51.     BOEM failed to take a "hard look" into PFAS contamination.

<u>BOEM overlooks South Fork Wind errors</u>

52.     In September 2018, South Fork Wind submitted to BOEM a Construction and Operations

Plan ("COP") for its proposed Project.  The COP reads— "Groundwater throughout most of

eastern Suffolk County is of generally high quality (NYSDOH, 2003). All freshwater

groundwater in New York State is Class GA, a source for potable water supply (NYSDOS,

2018b).  With rare exceptions, potable water supplied by community water systems in Suffolk

County meet all drinking water quality standards" (p. 4-56, PDF p. 219).

53.     In May 2021, three months *after* BOEM had received detailed information on existing

PFAS contamination (see above), South Fork Wind submitted to BOEM a revised COP.

54.     South Fork Wind's revised COP repeats the same misleading information concerning

groundwater quality *verbatim* from its COP that it submitted to BOEM *two-and-half years*

earlier (in September 2018) (see May 2021 COP, at p. 4-60, PDF p. 228).

55.     Neither South Fork Wind's COP of September 2018 nor its COP of May 2021

acknowledges *any* PFAS contamination.

56.     According to NEPA, BOEM "shall independently evaluate the information submitted [by

South Fork Wind] and shall be responsible for its accuracy. […] It is the intent of this paragraph

that acceptable work not be redone, but that it be verified by the agency" (NEPA 1978, 40 CFR

1506.5(a)).

57.     BOEM failed to evaluate or verify South Fork Wind's misleading statements concerning

the quality of groundwater supplies in Wainscott.

58.     BOEM did *not* consider environmental PFAS contamination along the proposed onshore

transmission cable route where South Fork Wind plans to excavate over 30,000 tons of material.

59.    In August 2021, BOEM referred to "NYSDEC (2018) groundwater quality standards" that were outdated and inapplicable to drinking water standards for a sole-source aquifer used for drinking water.

60.    The FEIS is over one thousand three hundred (1,317) pages and contains only one reference to PFAS contamination.  It reads – "Sampling at the fourth site […] has indicated the presence of perfluorinated compounds.  Site-related compounds have been identified in soil and groundwater within […] the site" (at p. H-23, PDF 655, ¶ 2, last sentence).

61.    BOEM inserts the two-sentence reference to PFAS contamination that poses a severe risk to human health and the environment deep within the FEIS (on page 655).


Nature of PFAS

62.    PFAS contamination released into soil leaches from the surface and spreads vertically and laterally (e.g., in surface run-off) into groundwater, carrying the contamination with it.

63.    The groundwater in Wainscott flows from a primary source of PFAS contamination at East Hampton Airport towards the Atlantic Ocean, generally flowing from the northwest to the southeast.

64.    Surface water in the form of run-off over sealed surfaces can carry PFAS contamination with it.

65.    Other than the primary source of contamination at East Hampton Airport, there are other sources of PFAS contamination.  For example, according to South Fork Wind's Final Hazardous Waste and Petroleum Work Plan (April 2021), firefighters extinguished a house fire at 75 Wainscott Northwest Road (close to Montauk Highway) in August 2007.

66.    Photographs show construction workers standing shoulder-deep in the soil near 75 Wainscott NW Road.  South Fork Wind showed no regard for their safety.

67.     South Fork Wind showed no regard for the environmental impacts from underground concrete infrastructure and excavation activities in an area containing PFAS contamination (see Appendix 2- Construction near house Fires, at p. 1).

68.     Another example of firefighters extinguishing a house fire occurred on Beach Lane in 1965.  According to South Fork Wind's Final Hazardous Waste and Petroleum Work Plan (April 2021), "Mr. and Mrs. John C. Tysen's summer home on Beach Lane, Wainscott was destroyed by fire."

69.     Photographs show construction workers standing shoulder-deep in the soil near the monitoring well (MW-4A) on Beach Lane, where PFAS contamination exceeds the 2016 EPA Health Advisory Level.

70.     South Fork Wind showed no regard for the environmental impacts from underground concrete infrastructure and excavation activities in an area containing PFAS contamination (see Appendix 2- Construction near house Fires, at p. 2).

71.     Exposure to PFAS contamination is not restricted to ingesting contaminated tap water at home but may have included past exposure at restaurants, and other homes, swimming in contaminated water, or drinking water in public places.

Existing PFAS (Wainscott)

72.     On September 9, 2020, South Fork Wind received notice of two Site Characterization Reports prepared for the New York State Department of Environmental Conservation (NYSDEC") showing extensive PFAS contamination concentrations in soil and groundwater in the vicinity of South Fork Wind's proposed (underground) construction corridor—

    a.  NYSDEC Site Characterization Report: East Hampton Airport (NYSDEC Site: 152250/152156).  See Exhibit C, BOEM Index of Documents, Exhibits #066 through

to #074 available at – www.regulations.gov/comment/BOEM-2020-0066-0386.

    b.  NYSDEC Site Characterization Report: Wainscott Sand and Gravel (NYSDEC Site Code 152254).  See Exhibit C,  BOEM Index of Documents, Exhibit #075.

73.  **NYSDEC** reports on PFAS contamination in the vicinity of South Fork Wind's construction corridor (below with links to dec.ny.gov) are herein incorporated by reference –

    a.  Fact Sheet.HW.152250.2018-01-05.Airport_Well Sampling Press Release SCDHS.pdf

    b.  Fact Sheet.HW.152250.2019-06-19.East Hampton Airport Class 02 Listing.pdf

    c.  Report.HW.152250.2018-11-12.Alpha Geoscience Hydrogeology Rpt Wainscott S&G.pdf

    d.  Report.HW.152250.2018-11-30.Airport Site Characterization Report Final.pdf

    e.  Work Plan.HW.152250.2021-06-30.East Hampton Airport Site RIFS WP-FINAL.pdf

    f.  Report.HW.152254.2020-07-28.Final SC Report.pdf

74.  The PFAS contamination concentration levels quoted below are taken from the site characterization reports (above), which I also summarized in my Initial Brief of January 20, 2021 (BOEM Index Exhibit #009, pp. 19-24).

75.  Wells at the Airport site (upgradient): EH-19A, EH-19A2, and EH-19B are within 1,000 feet from the proposed construction corridor, and Well EH-1 is within 500 feet from the South Fork Wind's construction corridor.

76.  Wainscott Sand and Gravel ("**Wainscott S&G**") (NYSDEC site: 152254) is adjacent, downgradient, and on the opposite side of the South Fork Wind's proposed construction corridor.

77.  Wells at the Wainscott S&G site (downgradient): MW5, MW3, and MW4 (groundwater),

and Wells: S1, S11, and S16 (soil), are within one hundred and fifty feet downgradient from the South Fork Wind's construction site.

78.     A similar profile of PFAS contamination at East Hampton Airport can be seen in wells on the opposite downgradient side of the construction corridor at the Wainscott S&G site.

79.     Combined concentration levels of PFOS and PFOA contamination in all four groundwater monitoring wells within one thousand feet upgradient from the construction corridor are more than double the 2016 USEPA Health Advisory Level ("**HAL**") of 70 ppt, regulatory standards that are designed to protect human health, as follows—

80.     Well: EH-19A   – PFOS/PFOA  =  145 ppt  (exceeds 2016 HAL by 2.1x)

81.     Well: EH-19A2  – PFOS/PFOA  =  174 ppt  (exceeds 2016 HAL by 2.5x)

82.     Well: EH-19B   – PFOS/PFOA  =  166 ppt  (exceeds 2016 HAL by 2.4x)

83.     Well: EH-1     – PFOS/PFOA  =  162 ppt  (exceeds 2016 HAL by 2.3x)

84.     The same levels of PFOS and PFOA contamination but measured against the updated 2022 USEPA (interim) HAL (0.02 ppt for PFOS and 0.004 ppt PFOA) are—

85.     Well: EH-19A   – PFOS  =     5 ppt  (exceeds 2022 HAL by     250 x)

        – PFOA  =   140 ppt  (exceeds 2022 HAL by  35,000 x)

86.     Well: EH-19A2  – PFOS  =   140 ppt  (exceeds 2022 HAL by   7,000 x)

        – PFOA  =    34 ppt  (exceeds 2022 HAL by   8,500 x)

87.     Well: EH-19B   – PFOS  =    77 ppt  (exceeds 2022 HAL by   3,850 x)

        – PFOA  =    89 ppt  (exceeds 2022 HAL by  22,250 x)

88.     Well: EH-1     – PFOS  =   1.8 ppt  (exceeds 2022 HAL by      90 x)

        – PFOA  =   160 ppt  (exceeds 2022 HAL by  40,000 x)

89.     Soil contamination levels from PFOS, PFOA, and PFHxS chemical compounds detected

on the shallow surface at the Airport site upgradient within one thousand feet of the construction

corridor are as follows –

| 90. | Well: EH-19A (soil) | – PFOS | = | 3,900 ppt |
|---|---|---|---|---|
| | | – PFOA | = | 180 ppt |
| | | – PFHxS | = | 170 ppt |
| 91. | Well: EH-19B (soil) | – PFOS | = | 12,000 ppt |
| | | – PFOA | = | 3,800 ppt |
| | | – PFHxS | = | 3,800 ppt |
| 92. | Well: EH-1 (soil) | – PFOS | = | 10,000 ppt |
| | | – PFOA | = | 180 ppt |
| | | – PFHxS | = | 170 ppt |

93.     Groundwater samples taken from monitoring wells on the opposite side of the corridor

from the source of contamination (at the Airport), within one hundred and fifty feet

downgradient from the construction corridor, all show exceedingly high levels of the same

chemical compounds (PFOA, PFOS, and PFHxS) seen in soil samples taken at the Airport.

94.     According to the NYSDEC Superfund Designation Site Environmental Assessment of the

Wainscott S&G— "Overall, the highest total PFAS detections were in monitoring wells MW3,

MW5, MW6 located on the Western (side-gradient) and Northern (upgradient) boundaries of the

site, indicating a potential off-site source."  See BOEM Index Exhibit #085 (at p. 2, Site

Environmental Assessment, last sentence).

95.     Contamination levels in groundwater monitoring wells within one hundred and fifty feet

downgradient from the corridor (on the western side of the Wainscott S&G site) for groundwater

("**GW**") Monitoring Wells MW5, MW3, and MW4 are as follows –

96.   Well: MW5 (GW)   – PFOS        =      877 ppt   (exceeds 2022 HAL by  43,850 x)

– PFOA        =       69 ppt   (exceeds 2022 HAL by  17,250 x)

– PFHxS       =      566 ppt

– PFOS/PFOA =      946 ppt     (exceeds 2016 HAL by 13.5 x)

97.   Well: MW3 (GW)   – PFOS        =    1,010 ppt   (exceeds 2022 HAL by  50,500 x)

– PFOA        =       28 ppt   (exceeds 2022 HAL by   7,000 x)

– PFHxS       =      306 ppt

– PFOS/PFOA =    1,038 ppt     (exceeds 2016 HAL by 14.8 x)

98.   Well: MW4 (GW)   – PFOS        =      232 ppt   (exceeds 2022 HAL by  11,600 x)

– PFOA        =     5.57 ppt   (exceeds 2022 HAL by   1,393 x)

– PFHxS       =     43.4 ppt

– PFOS/PFOA =      238 ppt     (exceeds 2016 HAL by 3.4 x)

99.   Groundwater containing levels of PFAS contamination exceeding USEPA limits flows from the source of contamination at the Airport site across South Fork Wind's construction corridor downgradient to the Wainscott S&G site, where the same chemical compounds are present in groundwater monitoring wells.

100.   BOEM received comments regarding PFAS contamination in February 2021, nine months *before* issuing its ROD (November 2021).  Still, it did not consult with, obtain comments from, or otherwise use "to the maximum extent possible" the special expertise of the EPA (a cooperating agency) regarding environmental impacts concerning PFAS contamination (NEPA 1978, 40 C.F.R. § 1501.6 and §1508.5).

101.   In 2022, South Fork Wind detected PFOA contamination in groundwater beneath Beach Lane in Monitoring Well 4A at a concentration level of 82 ppt which exceeds the 2016 EPA

Health Advisory Level (70 ppt).

102.    South Fork Wind proceeded with construction and excavation on Beach Lane near Well MW-4A, which was inconsistent with a manner that provides safety and protection of the environment according to the OCSLA (43 U.S.C. §§ 1331 *et seq*).  See Appendix 2 (p. 2).

103.    In 2020, the same well (MW-4A) contained PFOA contamination in groundwater at a concentration level of 50 ppt that exceeds the NYS MCL (10 ppt) and the 2022 EPA Interim Health Advisory Levels (with total PFAS contamination of 190 ppt).

104.    In 2022, South Fork Wind detected PFOA contamination (15 ppt) and PFOS contamination (13 ppt) in groundwater beneath Beach Lane in Monitoring Well 4B that exceeds the NYS MCL (10 ppt) and the 2022 EPA Interim Health Advisory Levels.

105.    In 2022, South Fork Wind detected PFOS contamination in groundwater beneath Wainscott NW Road in Monitoring Well 15A at a concentration level of 12 ppt that exceeds the NYS MCL (10 ppt) and the 2022 EPA Interim Health Advisory Levels.

106.    In 2020, the same well (MW-15A) contained PFOS contamination in groundwater at a concentration level of 15 ppt that exceeds the NYS MCL (10 ppt) and the 2022 EPA Interim Health Advisory Levels (with total PFAS contamination of 41 ppt).

107.    In 2021, South Fork Wind disclosed its laboratory test results for PFAS contamination and supporting documentation (for testing undertaken in December 2020 and January 2021). The disclosures showed that South Fork Wind took most soil samples from the shallow surface where PFAS contamination was less likely to be detected (see Exhibit E- 2022 Comments).

108.    In 2022, South Fork Wind has *not* disclosed laboratory test reports or supporting documentation for PFAS contamination testing conducted around January 2022.

[left blank]

## VII.   DODGING DUE PROCESS OF LAW

109.     In January 2017, the LIPA Board of trustees approved the 2017 PPA with South Fork
Wind.

110.     A Memorandum, "Authorization to enter into a Power Purchase Agreement with
Deepwater Wind South Fork, LLC for the South Fork Wind Farm Project," to the Board of
Trustees from LIPA's CEO (January 2017) ("**LIPA PPA Memo**"), defers environmental reviews
to be "conducted and […] supervised by the Bureau of Ocean Energy Management pursuant to
federal law […] [and] a certificate of environmental compatibility and public need from the
Public Service Commission pursuant to Article VII of the Public Service Law" (LIPA PPA
Memo, at p. 5, footnote 6, BOEM Index Exhibit #122).

111.     South Fork Wind and parties to the New York State Public service Commission
proceeding ("NYSPSC") (case 18-T-0604) received evidence of existing PFAS contamination
surrounding the proposed construction corridor in an interrogatory/document request titled "Si
Kinsella #1" dated November 15, 2019.

112.     South Fork Wind did *not* test soil or groundwater samples taken from within its proposed
construction corridor until the NYSPSC evidentiary hearing concluded (on December 8, 2020).

113.     On December 23, 2020, South Fork Wind tested soil or groundwater from its
construction corridor for the first time, fifteen days *after* the NYSPSC hearing had concluded.

114.     The NYSPSC did not require South Fork Wind to test soil or groundwater samples taken
from within its proposed construction corridor during the two years from September 2018 when
South Fork Wind submitted its Article VII application until the evidentiary hearing concluded
(December 8, 2020).

115.     BOEM neither discusses onshore PFAS contamination, suggests *any* possible mitigation

plans, nor considers alternatives specifically to avoid PFAS contamination.

116.    In its FEIS (of 1,317 pages), BOEM refers only to a fourth site, NYSDEC #152250, without saying where that site is relative to the construction corridor.

117.    BOEM states that sampling at the fourth site "has indicated the presence of perfluorinated compounds" without describing their impact on human health.

118.    BOEM admits only to "[s]ite-related compounds" that have been "identified" in soil and groundwater within and around the site, without identifying those compounds or stating that they pose a risk to public health and are a threat to the environment.  See FEIS, Section 3.3.2.1.2 Onshore Groundwater (at p. H-23, PDF p. 655).

119.    "Site-related compounds" include *any* compound related to the site, whether a harmful contaminant or safe naturally occurring compounds such as calcium or sodium.

120.    BOEM has denied the public the opportunity to scrutinize South Fork Wind testing samples of groundwater and soil for PFAS contamination taken from within its construction corridor.

121.    The NYSPSC did *not* consider South Fork Wind's high cost of power, the burden of which will rest with ratepayers in the service area.

122.    The New York State Department of Public Service ("NYSDPS") conducting the Article VII hearing admitted under cross-examination that— "There's no testimony in this, in our document, to the best of my recollection that addresses the cost to rate payers."  See BOEM Exhibit #009, Initial Brief, dated January 20, 2021 (at p. 15, last ¶).

123.    The ALJ conducting the NYSPSC hearing ruled on five occasions that the South Fork RFP and 2017 PPA are beyond the scope of this Article VII proceeding.

124.    The NYSPSC denied party-intervenor rights to examine and cross-examine witnesses

regarding the South Fork RFP and 2017 PPA.  See <u>BOEM Exhibit #021</u>, Motion to Reopen the Record, dated January 13, 2021(at pp. 3 – 4).

125.    In response to comments on South Fork Wind's high cost of power relative to other offshore wind farms, BOEM states— "Ratepayer costs depend on numerous variables beyond the scope of the EIS and which BOEM has no authority to change" (FEIS, at p. I-87, PDF p. 855, ¶ 1).

126.    Had BOEM chosen the "No Action" alternative, it would have changed Project-related ratepayer costs.

127.    BOEM dismisses the notion of a "comprehensive forecast of impacts […] to ratepayer costs" because it "depends on numerous variables beyond the scope of the EIS" (FEIS at p. I-345, PDF 1,113)

128.    BOEM does not discuss using a variable such as a price per unit of output (dollars per megawatt-hour) from each offshore wind contract and using standard market forecasts to compare wind farm contracts with alternatives.

129.    BOEM is obligated to review and consider the economic impacts of the Project.

130.    A higher price of energy impacts lower-income families disproportionately.

131.    BOEM does not request the participation of the U.S. Department of Energy ("DOE") or the Renewable Energy Laboratory ("NREL") according to 40 CFR  § 1501.6.

132.    The DOE and NREL already conduct such research and have expertise in this area.

133.    BOEM turned a blind eye to bid rigging designed to stifle competition and increase the price of power to consumers.

134.    BOEM's exercise of power is arbitrary and capricious and not according to the law, and violates my rights to due process guaranteed by the U.S. Constitution.

135.    BOEM's action to approve the project constitutes arbitrary interference with life, liberty, and property.


<u>Renewable Energy Requirements – 2019 CLCPA</u>

136.    The Record of Decision ("**ROD**") asserts that the "Project will contribute to New York's renewable energy requirements, particularly the state's goal of 9,000 MW of offshore wind energy generation by 2035[,]" referring to New York State's Climate Leadership and Community Protection Act ("**2019 CLCPA**") enacted in July 2019 (New York Environmental Conservation Law ("**NY ECL**") § 75-0103(13)(e)).

137.    The Final Environmental Impact Statement ("**FEIS**") asserts that "South Fork Wind, LLC, is proposing the Project, <u>which is designed to contribute</u> to New York's renewable energy requirements, particularly, the state's goal of generating 9,000 megawatts of offshore wind energy by 2030 [emphasis added]" in reference (again) to New York State's 2019 CLCPA.

138.    BOEM provides no proof supporting its claims in the two paragraphs (above).

139.    BOEM introduces the 2019 CLCPA into the NEPA process and is statutorily mandated to evaluate and take responsibility for any claim upon which it relies arising out of the 2019 CLCPA, including but not limited to whether the South Fork Wind Project is consistent with "a manner that seeks […] to minimize costs" (NY ECL § 75-0109(3)(a)).

140.    South Fork Wind submitted the Project proposal for consideration in Request for Proposals South Fork Resources, issued in June 2015 ("**South Fork RFP**" or "**SFRFP**").

141.    BOEM received a copy of the South Fork RFP in February 2021 and posted it online – <u>www.regulations.gov/comment/BOEM-2020-0066-0387</u> (see "<u>Testimony Pt 2 - Exhibit 02 - South Fork RFP June 24, 2015</u>" Exhibit #102).

142.    The Project resulted from the South Fork RFP procurements process.

143.    The Project proposal had to be submitted by the South Fork FRP submittal deadline in November 2015, later revised to December 2015.

144.    According to the South Fork RFP and PSEG Long Island's South Fork Resources RFP Evaluation Guide (December 2015) ("**RFP Evaluation Guide**"), the Project proposal "must contain" the following— "a description of each proposed resource" solution, "the location of any proposed facility" requiring construction and/or permitting, "a description of key features and functions" of the resource, and proposed pricing that "shall include all costs" — otherwise the proposal would be deemed non-responsive.

145.    According to the South Fork RFP requirements and the RFP Evaluation Guide, the South Fork Wind Project would have had to have been substantively designed by the submittal deadline in December 2015.

146.    The South Fork RFP submittal deadline (December 2015) predates the New York State 2019 CLCPA by three-and-a-half years.

147.    It is implausible that the South Fork Wind Project was "designed to contribute" to specific provisions and regulations as defined in a law that did *not* exist at the time and would *not* exist for three-and-half years.

148.    BOEM provides no details as to any further "renewable energy requirements" other than to cite "the state's goal of 9,000 MW of offshore wind energy generation by 2035."

149.    BOEM provides neither discussion nor supporting documentation nor incorporates by reference the "state's goal of 9,000 MW of offshore wind energy generation by 2035."

150.    BOEM does not list any agency or authority of New York State as a cooperating agency (or authority) in its FEIS or ROD.

151.    The New York State 2019 CLCPA mandates that in "promulgating these regulations, the department [N.Y.S. Department of Environmental Conservation] shall: a. Design and implement all regulations in a manner that seeks […] to minimize costs […][emphasis added]" (NY ECL § 75-0109(3)(a)).

152.    The 2019 CLCPA mandates that in "developing such plan the council shall […] b. Evaluate, using the best available economic models, emission estimation techniques and other scientific methods, the total potential costs […] of the plan […][emphasis added].  In conducting this evaluation, the council shall quantify […] ii. The costs of implementing proposed emissions reduction measures […][emphasis added]"  (NY ECL § 75-0103(14)(b).

153.    The 2019 CLCPA mandates the consideration of costs.

154.    BOEM asserts that the "Project will contribute to […] the state's goal of 9,000 MW of offshore wind energy generation by 2035" without taking a "hard look" to ensure that the Project is consistent with the 2019 CLCPA in "a manner that seeks […] to minimize costs" (NY ECL § 75-0109(3)(a)).

155.    BOEM approved the Project because it will allegedly contribute to the 2019 CLCPA.

156.    BOEM received evidence related to the Project's high cost of power.

157.    BOEM received evidence in February 2021 showing that the utility, the Long Island Power Authority ("LIPA"), around the time it executed a power purchase agreement with South Fork Wind (February 2017) ("**2017 PPA**"), valued the cost of energy at $219 per megawatt-hour or 21.9 cents per kilowatt-hour.

158.    On September 30, 2020, LIPA executed an amendment to the 2017 PPA.  The amended 2017 PPA permitted South Fork Wind to expand the South Fork Wind Farm by adding forty megawatts (40 MW) of generating capacity (from 90 MW to 130 MW).

159.    According to the Contract Encumbrance Request approved by LIPA VP Operations Oversight Rick Shansky on March 17, 2021, the total cost of energy from the Project per the amended 2017 PPA (130 MW) over the life of the contract is $2,013,000,000.

160.    According to the initial Contract Encumbrance Request approved by LIPA CFO Joseph Branco (on January 30, 2017), the total cost of energy from the Project per the 2017 PPA (90 MW) over the contract's life is $1,624,738,893.  Projected delivered energy is 371,604 megawatt-hours per year or 7,432,080 megawatt-hours over the twenty-year contract life.

161.    According to the initial Contract Encumbrance Request, the cost of power from the South Fork Wind Farm (90 MW) is $219 per megawatt-hour ($1,624,738,893 divided by 7,432,080 megawatt-hours) or 21.9 cents per kilowatt-hour.

162.    According to both the initial and revised Contract Encumbrance Requests, the total cost of the increase in capacity (of 40 MW) is $388,261,107 ($2,013,000,000 less $1,624,738,893).

163.    According to an Offshore Wind Project Study Final Technical Report LIPA presented to the U.S. Department of Energy's Office of Energy Efficiency and Renewable Energy ("**OSW Technical Report**"), LIPA projects "additional annual delivered energy up to 165,157 MWh" from the South Fork Wind Farm's incremental increase of 40 MW (see Exhibit F- LIPA OSW Tech Report).

164.    According to the OSW Technical Report, the projected delivered energy from the incremental increase of 40 MW in offshore wind capacity over the contract's life is 3,303,140 megawatt-hours (165,157 MWh multiplied by 20 years).

165.    According to Contract Encumbrance Requests and OSW Technical Report, the cost of energy from the incremental increase in offshore wind capacity of 40 MW is $118 per megawatt-hour ($388,261,107 divided by 165,157 MWh) or 11.8 cents per kilowatt-hour.

166.    According to the initial Contract Encumbrance Request and the OSW Technical Report, the projected delivered energy from the (130 MW) Project is 536,761 megawatt-hours per year (371,604 MWh in addition to 165,157 MWh), or 10,735,220 megawatt-hours over the twenty-year contract life (536,761 MWh multiplied by 20 years).

167.    According to the Contract Encumbrance Requests and the OSW Technical Report, the cost of power from the (130 MW) South Fork Wind Farm is $188 per megawatt-hour ($2,013,000,000 divided by 10,735,220 MWh), or 18.8 cents per kilowatt-hour.

168.    The price of energy from South Fork Wind is summarized as follows –

|    | Offshore Wind Farm Project | Contract Size (MW) | Year Signed | Duration (years) | Offtake State | Contract Type | Levelized Nom. Price ($/MWh) |
|----|----------------------------|--------------------|-------------|------------------|---------------|---------------|------------------------------|
| a. | South Fork Wind | 90 | Jan 2017 | 20 | NY | PPA | $219 |
| b. | South Fork Wind | 40 | **Sep 2020** | 20 | NY | PPA | **$118** |
| c. | South Fork Wind | 130 | | | | | **$188** |

169.    In February 2021, BOEM received a report by the U.S. Department of Energy National Renewable Energy Laboratory ("NREL"), Comparing Offshore Wind Energy Procurement and Project Revenue Sources Across U.S. States (dated June 2020) ("**NREL OSW Report**").

170.    BOEM subsequently posted the NREL OSW Report online – www.regulations.gov/comment/BOEM-2020-0066-0387, see "Exhibit I - NREL Comparing Offshore Wind Energy June 2020" BOEM Index Exhibit #118).

171.    According to the NREL OSW Report, Table A-2. U.S. Offshore Wind Offtake Agreements (at p. 41) the 2020 Levelized Price ($/MWh) for other wind farms in the same Wind Energy Area as South Fork Wind are as follows (per signed contract) –

|   | Offshore Wind Project | Duration | Offtake State | Contract Type | Levelized Price ($/MWh) |
|---|---|---|---|---|---|
| a. | Vineyard Wind 1 | 20 | MA | PPA | $74.00 |
| b. | Vineyard Wind 1 | 20 | MA | PPA | $65.00 |
| c. | Revolution Wind | 20 | RI | PPA | $94.43 |
| d. | Revolution Wind | 20 | CT | PPA | $99.50 |
| e. | Revolution Wind | 20 | CT | PPA | $98.43 |
| f. | Sunrise Wind | 25 | NY | NY OREC | $83.36 |
| g. | Mayflower Wind | 20 | MA | PPA | $58.47 |
| h. | Mayflower Wind | 20 | MA | PPA | $58.47 |
| i. | | | Average 2020 Levelized Price ($/MWh): | | **$78.96** |

172.    BOEM approved a Project where the price of energy ($188 /MWh) is nearly two and half times the average price ($79 /MWh) of the other wind farms in the same Wind Energy Area— Vineyard Wind, Revolution Wind, Sunrise Wind, and Mayflower Wind.  See Table 1 (above).

173.    The Project BOEM approved provides the same renewable offshore wind energy as the other wind farms in the same Wind Energy Area but at more than double the average cost.

174.    Approving a Project where the cost of energy is more than double the average cost of the other wind farms is inconsistent with "a manner that seeks […] to minimize costs" and contrary to the mandated provisions of the 2019 CLCPA.

175.    The Project BOEM approved does not comply with the 2019 CLCPA.

176.    The Project is inconsistent with the requirements of the 2019 CLCPA to reduce negative impacts on disadvantaged communities, including but not limited to those that "possess certain socioeconomic criteria, or comprise high-concentrations of low- and moderate- income households" (NY ECL § 75-0101(5)).

177.    "BOEM prepared the FEIS with the assistance of a third-party contractor" (FEIS, p. 2).

178.    According to NEPA— "If the document is prepared by contract, the responsible Federal official shall furnish guidance and participate in the preparation and shall independently evaluate the statement prior to its approval and take responsibility for its scope and contents" (NEPA 1978, 40 CFR § 1506.5(c)).

179.    BOEM's asserted purpose, that "South Fork Wind, LLC, is proposing the Project, which is designed to contribute to New York's renewable energy requirements, particularly, the state's goal of generating 9,000 megawatts of offshore wind energy by 2030[,]" is conclusory and *not* based in fact.

_____

Environmental Justice

180.    In November 2018, three years before issuing its ROD (on November 24, 2021), BOEM received comments (see Exhibit A- 2018 Comments) in response to South Fork Wind's Construction and Operations Plan ("COP") regarding issues concerning potential negative impacts on social and economic resources (according to 30 CFR 585.627(a)(7)).

181.    The 2018 Comments provide the calculation for the Project's cost of power from its initial 90-megawatt facility, which is "approximately 22 ¢/kWh."

182.     The 2018 Comments draw BOEM's attention to South Fork Wind's noncompliance with 30 CFR 585.627(a)(7) and read as follows: "The Applicant will force ratepayers living on Long Island to pay exorbitantly high electricity prices.  This money is money that will not be spent within the local economy. Instead of a family eating at a local restaurant or buying new shoes for their children, this money will go overseas into the pockets of Ørsted, a foreign company […]."

183.    The 2018 Comments draw BOEM's attention to South Fork Wind's noncompliance with

30 CFR 585.627(a)(7) and read as follows: "The Applicant has failed to comply with 30 CFR 585.627(a)(7) with specific regard to its potential negative impact upon lower income groups. Any increase in electricity prices will fall disproportionally on those who can least afford it. A family on a low income will have to heat or cool their home in the same way a family on a higher income will have to do, so any increase in electricity prices will represent a larger proportion of a low-income family's income than it will a higher-income family. This will cause families on lower incomes who are already hurting to suffer further more economic hardship than families on higher incomes."

184.    BOEM failed to address the Project's adverse impact on low-income families according to 30 CFR 585.627(a)(7).

185.    Specifically, South Fork Wind is required to "describe those resources, conditions, and activities listed in the following table that could be affected by [its] proposed activities […], including: […] Social and economic resources" such as "[e]mployment […][and] minority and lower income groups" (30 CFR 585.627(a)(7)).

186.    The FEIS limits its analysis of socioeconomic resources to the "ocean economy[.]"

187.    BOEM defines the ocean economy to be "economic activity dependent upon the ocean, such as commercial fishing and seafood processing, marine construction, commercial shipping and cargo handling facilities, ship and boat building, marine minerals, harbor and port authorities, passenger transportation, boat dealers, and ocean-related tourism and recreation (National Ocean Economics Program 2020)" (FEIS at p. 3-157, PDF p. 209, last ¶).

188.    BOEM alleges that the Project will have a beneficial economic.

189.    BOEM's economic analysis includes estimates of the project's capital expenditures (ranging from $184 to $247 million) and yearly operational expenditures (ranging from $6.16 to

$12.32 million). The range depends on whether the offshore wind farm capacity is ninety megawatts (the low estimate) or one hundred and eighty megawatts (the high estimate). See FEIS (at p. F-17, PDF p. 587).

190.   Considering the wind farm will have a capacity of 130 megawatts, the total beneficial economic impact is approximately $390 million over twenty years.

191.   The economic analysis does not consider the cost of the Project.

192.   The cost of the Project is built into the cost of energy that LIPA will pass onto ratepayers.

193.   The Project cost is money that will be taken out of the economy and represents an *adverse* economic impact.

194.   LIPA estimates the total cost of the Project's energy to be $2.013 billion (over twenty years).

195.   BOEM does not consider the Project's cost of $2.013 billion in its socioeconomic analysis.

196.   The Project's price tag of $2.013 billion will have to be paid by ratepayers living in Suffolk County.

197.   The scope of BOEM's economic analysis is limited to the "ocean economy" around a few coastal ports such as New Bedford (MA), Providence (RI), New London (CT), and Montauk (NY), which includes only 3.9% of Suffolk County (based on population).

198.   The Project's high cost of power is money that South Fork Wind withdraws out of the economy and has a corresponding *adverse* economic impact ($2.013 billion) that is more than five times greater than the total beneficial economic impact ($390 million).

199.   The Project's net *adverse* economic impact is approximately $1.623 billion.

200.   As explained in the 2018 Comments to BOEM (at pp. 4 - 5)— "There are well over one

million ratepayers living on Long Island who will be forced to absorb into their everyday household budgets vastly inflated prices for electricity […][SFW] plans to administer a sedative to the Long Island economy in the form of high electricity prices that will steal away what would otherwise be adrenalin driving the local economy forward. The […] wind farm will be a drag on economic growth that will lead to increased unemployment […] [and] put Long Island at a distinct disadvantage. […] This will drive economic development and employment away from Long Island toward other states. If a manufacturer is looking for a location to build a new plant, for example, it will likely look to Massachusetts where the price of electricity is less than a third the price that it is on Long Island."

201.   BOEM ignored the 2018 Comments and has *not* accounted for the *adverse* economic impact on Suffolk County.

202.   BOEM alleges that "the Proposed Project could have […] beneficial impacts on […] employment, and economics" (ROD at p. D-8, PDF 100, ¶ 1).  BOEM's claim is contradicted by the fact that for every dollar the developers put into the economy (in terms of wages, supplies, capital expenses, etc.), it is withdrawing more than five times that amount out of the economy.

203.   The Project does *not* have a "beneficial impact" but an ___adverse economic impact___.

_____

204.   The FEIS neither identifies nor considers the adverse effects of its proposed activities, specifically the high cost of power, on social and economic resources such as employment and minorities and lower income groups according to NEPA regulations.

205.   The FEIS limits its environmental justice analysis to "cities/towns, counties, and states where potentially affected ports or landing sites are located" (at p. 3-168, PDF p. 220).

206.   The FEIS limits the area to "[f]ive-km zones […] drawn around potentially affected ports

or landing sites[,]" which further reduces the size of the analysis area (at p. 3-170, PDF p. 222).

207.    The FEIS does *not* consider matters of Environmental Justice in any area of Suffolk County *other* than within 3.1 miles (five kilometers) of the Shinnecock Fishing Dock, Greenport Harbor, Montauk, Beach Lane, or Hither Hills.

208.    According to the FEIS, the population used to assess Environmental Justice is equal to 3.9% of the total population of Suffolk County (at pp. 3-168 to 3-173, PDF pp. 220-225, Tables 3.5.4-1, 3.5.4-2, and 3.5.4-3, Analysis Area "Population in 5-Km Zone" of 58,878 divided by Total Population in Suffolk County 1,497,595).

209.    Executive Order 12898– <u>Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations</u>– provides that "each Federal agency shall make achieving environmental justice part of its mission […]."

210.    In the accompanying Memorandum from the President to Heads of Departments and Agencies, Comprehensive Presidential Documents No. 279 (February 11, 1994), the President identifies ways to consider environmental justice under NEPA, including— "Review of NEPA compliance […] must ensure that the lead agency preparing NEPA analyses and documentation has appropriately analyzed environmental effects on minority populations, low-income populations, or Indian tribes, including human health, social, and economic effects."

211.    Defendants failed to comply with Executive Order 12898.

212.    BOEM failed to meet its statutory obligation to make a determination "that <u>economic or social</u> and natural or physical environmental effects are interrelated" to inform the public as to whether the "environmental impact statement shall discuss and give appropriate consideration to these effects on the human environment [emphasis added]" (40 C.F.R. § 1502.16(b)).

213.    According to NEPA, BOEM "shall independently evaluate the statement [FEIS] prior to

its approval and take responsibility for its scope and contents" (NEPA 1978, 40 CFR 1506.5(c)).

214.    The FEIS and ROD neither identify nor considers <u>economic or social</u> impacts resulting from South Fork Wind's relatively high cost of power and its "effects on the human environment" (40 C.F.R. § 1502.16(b)).

215.    South Fork Wind's high cost of power is contrary to the Administration's "Action to Spur Domestic Clean Energy Manufacturing" issued June 6, 2022, Authorizing Defense Production Act to <u>Lower Energy Costs</u>, Strengthen Power Grid, and Create Good-Paying Jobs.  The White House Statement's opening sentence reads (in relevant part): "Today's clean energy technologies are a critical part of the arsenal we must harness <u>to lower energy costs for families</u> […][emphasis added]"  (<u>www.whitehouse.gov/briefing-room/statements-releases/2022/06/06/fact-sheet-president-biden-takes-bold-executive-action-to-spur-domestic-clean-energy-manufacturing/</u>).

216.    BOEM's ROD asserts that the Project furthers "<u>some</u> of the goals stated in Executive Order 14008, Tackling the Climate Crisis at Home and Abroad" (ROD, at p. D-28, PDF p. 120, last ¶).

217.    Executive Order 14008 reads: "We must strengthen our […] water protections. […] We must deliver environmental justice in communities all across America." (see <u>https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/27/executive-order-on-tackling-the-climate-crisis-at-home-and-abroad/</u> Part II).

218.    BOEM failed to consider groundwater PFAS contamination and environmental justice issues related to the Project's *adverse* economic impact.

———————————————————

<u>Owners: "diseconomies of scale."</u>

219.    In February 2021, BOEM received a document titled "Initial Brief" (dated January 20,

2021) concerning, *inter alia*, the non-competitive nature of the South Fork RFP.  BOEM posted

the document online at – www.regulations.gov/comment/BOEM-2020-0066-0385 (see "Initial

Brief - 1 by Kinsella Jan 20, 2021" BOEM Index Exhibit #009).

220.    BOEM received information showing that the joint and equal (indirect) owners of South

Fork Wind, Ørsted and Eversource, recommended in a regulatory submission to the New York

State Energy Research and Development Authority ("NYSERDA") that it "establish a minimum

capacity bid of 400 MW" because [citing NYSERDA's OSW Policy Options Paper] "Small

initial projects are not likely to deliver cost savings.  Due to diseconomies of scale, the costs per

unit of energy for projects of 100 MW and 200 MW in size are significantly higher than those for

400 MW projects.  As a result, […] program costs for such smaller projects would be

comparable to those of a 400 MW project despite their smaller size and energy output."  See

BOEM Index Exhibit #169, Comments of Bay State Wind that is a joint venture special purpose

entity (indirectly) owned by equal partners, Ørsted and Eversource, that also (indirectly) own

South Fork Wind (another special purpose entity) in Response to Request for Information OSW-

2018.

221.    In other words, the ultimate owners of the South Fork Wind Project admit, albeit, under

the name of Bay State Wind, that small projects like the South Fork Wind Farm are *not* likely to

deliver cost savings due to diseconomies of scale.

222.    The NYSERDA OSW Policy Options Paper is part of New York's Offshore Wind

Masterplan that prescripts minimum capacity awards of 400 megawatts.

223.    According to the NYSERDA OSW Policy Options Paper, the South Fork Wind Farm (of

only 130 megawatts) does *not* have a commercial capacity large enough to achieve economic

advantages of scale.

224.    The South Fork Wind Farm Project does *not* meet the requirements of New York's Offshore Wind Masterplan.

225.    The South Fork Wind Project has a maximum generating capacity of 2 MW per mile of transmission (130 MW divided by 66 miles).

226.    The average maximum generating capacity for three offshore find farms— Revolution Wind, Sunrise Wind, and Vineyard Wind— in the same area as South Fork Wind is 7.5 MW per mile of transmission (see Appendix 4- SFW Project Tables, Table 1, at p. 1).

227.    In other words, the South Fork Wind Project has to install four times more transmission per megawatt capacity than the average of three offshore wind projects in the same area.

228.    BOEM failed to take a "hard look" into the economics of the Project and did not compare it to alternatives.

229.    BOEM approved a Project that is <u>un</u>economic by design.

_____

<u>2017 PPA</u>

230.    Under the heading of <u>Purpose and Need</u>, the FEIS and ROD assert that "South Fork Wind's goal is to fulfill its <u>contractual commitments</u> to Long Island Power Authority (LIPA) pursuant to a power purchase agreement executed in 2017 <u>resulting from LIPA's technology-neutral competitive bidding process</u> [emphasis added]."

231.    The "power purchase agreement executed in 2017" is the **2017 PPA**.

232.    The alleged "technology-neutral competitive bidding process" is the **South Fork RFP**.

233.    BOEM introduces the 2017 PPA and the South Fork RFP into the NEPA process and, therefore, is statutorily mandated to evaluate and take responsibility for any claim upon which it relies related to the 2017 PPA or the South Fork RFP.

234.    BOEM does not identify any "contractual commitments" pursuant to the 2017 PPA.

235.    BOEM does not discuss South Fork Wind's "contractual commitments[.]"

236.    BOEM adopts South Fork Wind's goal to fulfill <u>unspecified</u> contractual commitments.

237.    BOEM does not attach or annex the 2017 PPA as an exhibit or include the 2017 PPA in its FEIS or ROD.

238.    BOEM does not specify an underlying purpose or need for "South Fork Wind's goal […] to fulfill its contractual commitments [emphasis added]" against which BOEM can measure and assess reasonable alternatives.

239.    BOEM received a copy of the 2017 PPA in February 2021 and posted it online at – <u>www.regulations.gov/comment/BOEM-2020-0066-0387</u> (see "<u>Testimony Pt 2 - Exhibit 03 - Power Purchase Agreement Feb 2017</u>" <u>BOEM Index Exhibit #099</u>).

240.    "The agency shall independently evaluate the information submitted [by South Fork Wind] and shall be responsible for its accuracy"  (NEPA 1978, 40 CFR 1506.5(a)).

241.    Carelessly, BOEM adopts and incorporates South Fork Wind's goal, as expressed in the 2017 PPA as *its* goal without verifying its contents.

242.    The 2017 PPA mandates that the "Seller [South Fork Wind] shall comply with the requirements of Appendix 16 with respect to the M/WBE/VET subcontracting goals" (at p. 50, ¶ 12.22).  Under the heading of <u>Contract Goals</u>, Appendix 16 "establishes an overall goal of 0 % for Minority and Women-Owned […], 0 % for Minority-Owned […] and 0 % for Women-Owned Business Enterprises […] participation […]."

243.    Appendix 16 reiterates these goals and, in addition, lists New York State Service-Disabled Veteran-Owned Business Participation as follows –

244.        "<u>M/WBE/VET Contract Goals</u>

245.         0% Minority and Women's Business Enterprise Participation

246.        0% Minority Business Enterprise Participation

247.        0% Women's Business Enterprise Participation

248.        0% New York State Service-Disabled Veteran-Owned Business Participation."

249.    BOEM approved South Fork Wind's "Contract Goals" that expressly <u>exclude minorities, women, and NYS Service-Disabled Veterans</u> who own businesses "opportunity to participate in […] contracting activity for the procurement of goods and services" according to the Amended 2017 PPA.

250.    BOEM's stated purpose relies on "<u>contractual commitments</u>" that exclude minorities, women, and NYS Service-Disabled Veterans business owners from participating in a contracting activity related to the Project.

251.    The "Contract Goals" that <u>exclude minorities, women, and NYS Service-Disabled Veterans</u> is contrary to Executive Order 12898– <u>Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations</u> and the accompanying Memorandum to Heads of Departments and Agencies.

_____

<u>BOEM Ignores Alternatives</u>

252.    BOEM received comments with supporting documentation showing that transmitting power from farther western mid-Long Island to the Town of East Hampton on eastern Long Island was not just technically feasible but is a part of LIPA's planning.

253.    In October 2019, LIPA issued a press release: "LIPA will also buy an estimated 90 MW of offshore wind from the recently announced 1,700 MW of New York State projects." See South Fork Wind Fact Sheet, <u>BOEM Index Exhibit #048</u> (at p. 3, ¶ 3).

254.    The "recently announced 1,700 MW of New York State projects" refers to Empire Wind

(816 MW) and Sunrise Wind (880 MW).

255.    LIPA can purchase power from only Sunrise Wind due to technical constraints of the Long Island transmission system.

256.    It logically follows that, according to the LIPA Fact Sheet, LIPA plans to buy 90 MW of power from Sunrise Wind.

257.    LIPA would not announce plans to buy energy from an offshore wind farm if it knew it was technically unfeasible.

258.    The Fact Sheet states that "LIPA will responsibly buy offshore wind," under which it reads: "Share of Recent NYSERDA Awards: Estimated @ 90 MW" and "Future Offshore Wind Projects: Estimated @ 800+MW"  (see South Fork Wind Fact Sheet, BOEM Index Exhibit #048 (at p. 3, top right graphic).

259.    LIPA plans to buy an additional 800 MW of offshore wind generating capacity.

260.    BOEM received comments on an alternative to South Fork Wind that would combine it with Sunrise Wind (the "Sunrise Alternative").

261.    The connected project would be technically, environmentally, and economically superior.

262.    South Fork Wind and Sunrise Wind use the same alternating current interconnection cable array that can be interconnected.

263.    The South Fork Wind Farm is only a few miles from the Sunrise Wind Farm.

264.    South Fork Wind and Sunrise Wind are owned (indirectly) by the same joint and equal partners, Ørsted and Eversource.

265.    The interconnected Sunrise Alternative would avoid disturbing onshore PFAS contamination, reduce the offshore impact on the marine environment by eliminating sixty-six miles of trenching and reducing transmission cable requirements, and reduce the impact on the

onshore community.

266.    BOEM (falsely) asserts that— "No other cable landing site alternatives were identified during Project development or scoping […] (see New York Article VII submitted by SFW)" (FEIS, p. 2-19, PDF p. 45, final ¶).

267.    Contrary to BOEM's (false) claim, the Sunrise Alternative *was* identified and discussed during the project's development, scoping, *and* the New York State Public Service Commission proceeding to which BOEM refers.

268.    The Commission's final ruling identifies the Sunrise/South Fork alternative *eight times*.

269.    The Commission's final ruling discusses the proposition "that the Sunrise Wind project and the South Fork Wind project should be combined, concluding that two nearby, but separate, projects make little economic sense."  (See NYSPSC 18-T-0604, Order Adopting Joint Proposal issued March 18, 2021, at p. 88, ¶ 3).

270.    BOEM (falsely) asserts that "the final EIS evaluates and discloses the impacts of […] the Beach Lane […] site" (FEIS p. 2-20, PDF p. 46, ¶ 1) as grounds for *not* carrying forward alternatives that would eliminate the site such as the Sunrise Alternative.

271.    BOEM neither "evaluates" nor "discloses" critical environmental impacts concerning known PFAS contamination of soil and groundwater along Beach Lane.

272.    BOEM neither acknowledged nor considered the alternative to South Fork Wind that would combine it with Sunrise Wind.

273.    LIPA designed the South Fork Wind Fact Sheet to deceive the reader.

274.    LIPA designed the graph titled A Developing Offshore Wind Industry (at p. 3) to deceive the reader (see Appendix 3- LIPA Graph Corrected).

275.    LIPA distorted the horizontal axis, which gives a false impression of timing (compare the

two graphs in Appendix 3).

276.    The contract price for the South Fork Wind Farm (90 MW) is placed above the wrong

year (2015).

277.    South Fork Wind and LIPA executed the power purchase agreement in February 2017

(not 2015).

278.    The contract price for the South Fork Wind Farm (90 MW) reads "16.3¢" when, at the

time, LIPA valued the average price of power at 21.9 cents (per kilowatt-hour).

279.    LIPA indicates that the South Fork Wind Farm Upgrade (40 MW) occurred in early 2018

(see green arrow), but South Fork Wind and LIPA executed the power purchase agreement

amendment in September 2020.

280.     LIPA and South Fork Wind engaged in a deliberate campaign to mislead the public over

the price of energy from the South Fork Wind Project.

_____

## 2015 South Fork RFP

281.    BOEM refers to South Fork Wind's "power purchase agreement executed in 2017

resulting from LIPA's <u>technology-neutral competitive bidding process</u> [emphasis added]."

282.    BOEM copied the language from South Fork Wind's Construction and Operations Plan

dated May 2021 (see p. I-29).

283.    "LIPA's technology-neutral competitive bidding process" refers to the South Fork RFP.

284.    In February 2021, BOEM received comments that included a Memorandum from LIPA

to the New York Office of the State Comptroller "Re: LIPA's 2015 Request for Proposals for

South Fork Resources" dated January 27, 2017 (the "**LIPA Memo**") and posted it online –

www.regulations.gov/comment/BOEM-2020-0066-0385 (see "Motion to Reopen Supp - Exhibit A - LIPA Memo Re South Fork RFP" BOEM Index Exhibit #030).

285.    The LIPA Memo reads:  "In some instances, proposals were advanced if they were the only proposal offering a particular technology [...]."

286.    The LIPA Memo continues:  "Two other proposals (i.e., Deepwater Wind [One] [DWW100] and Fuel Cell Energy [FCE100]) were designated as Semi-Finalists because […] they were the only proposals offering a particular technology." (NB: The square brackets are as written in the original document, and "Deepwater Wind [One] [DWW100]" refers to the 90 MW South Fork Wind Project.)

287.    The LIPA Memo continues: "Two proposals (i.e., NextEra Energy [NEX100] and Halmar International [HAL100]) were designated because they were the only proposals offering a particular technology." (NB: The square brackets are written in the original document.)

288.    BOEM received a copy of a memorandum from LIPA showing that the South Fork RFP considered technology when advancing proposals.

289.    BOEM received objective evidence (written by LIPA) showing that the South Fork RFP was *not* "neutral" concerning technology.

290.    BOEM asserts that the 2017 PPA resulted from a "technology-neutral competitive bidding process" when it received substantive evidence to the contrary.

291.    The "power purchase agreement executed in 2017" did *not* result "from LIPA's technology-neutral competitive bidding process."

292.    No such "power purchase agreement executed in 2017 resulting from LIPA's technology-neutral competitive bidding process" exists.

Non-competitive bidding process

293.    During Public Hearing #3 on February 16, 2021, BOEM heard the following oral

testimony— "The company that administered the procurement process, PSEG Long Island,

awarded South Fork Wind [a] power purchase agreement to its business partner in a

noncompetitive recruitment [procurement] process [emphasis added]."

294.    In February 2021, BOEM received comments concerning LIPA's award of a "PPA

pursuant to a non-competitive opaque procurement process […][emphasis added]."  BOEM

posted the letter online at –www.regulations.gov/comment/BOEM-2020-0066-0343 (see "South

Fork Wind, DEIS Comments by Kinsella (Feb 22, 2021)" BOEM Index Exhibit #001).

295.    In February 2021, BOEM received a document titled Initial Brief (dated January 20,

2021) concerning the non-competitive nature of the South Fork RFP.  BOEM posted the record

online – www.regulations.gov/comment/BOEM-2020-0066-0385 (see "Initial Brief - 1 by

Kinsella Jan 20, 2021" BOEM Index Exhibit #009).

296.    The Initial Brief reads as follows –

    "[S]ubstantial evidence exists sufficient to sustain the burden of proof required to

    rebut the presumption of validity attached to the PPA inasmuch as the PPA was

    awarded to the Applicant subject to a competitive bidding process.  Substantial

    evidence rebutting the presumption of validity includes written testimony (of 52

    pages) by me signed before a notary together with thirty (30) exhibits mostly from

    New York State and US federal agencies (of 640 pages), and sixteen (16) exhibits

    containing offshore wind speed data from the US National Oceanic and Atmospheric

    Administration (NOAA) (of 8,828 pages).  I submitted testimony and exhibits […]

    under the title: Testimony Part 2 – Public Interest, Need & Price."

297.    In February 2021, BOEM received all the documents (referred to in the preceding

paragraph) and posted them online –

www.regulations.gov/comment/BOEM-2020-0066-0343,

www.regulations.gov/comment/BOEM-2020-0066-0384,

www.regulations.gov/comment/BOEM-2020-0066-0385,

www.regulations.gov/comment/BOEM-2020-0066-0386,

www.regulations.gov/comment/BOEM-2020-0066-0387.

298.    No New York State agency or authority cooperated in developing the FEIS.

299.    BOEM is not relieved of its statutorily mandated obligation "to use all practicable means […] to improve and coordinate Federal plans, functions, programs, and resources to […] assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings [emphasis added]" (NEPA 42 U.S. Code § 4331(b)(2)).

300.    BOEM received testimony, briefs, and exhibits and is compelled to take a "hard look" and "use all practicable means" to ensure for all residents living in Wainscott "safe, healthful, productive, and esthetically […] pleasing surroundings[.]"

301.    BOEM had "practicable means" to access the electronic files it received in February 2021 because it posted them online.

302.    BOEM has online access to the entire evidentiary record and procedural history in the New York State Public Service Commission hearing (docket 18-T-0604) on the South Fork Wind's Project that is available –

https://documents.dps.ny.gov/public/MatterManagement/CaseMaster.aspx?MatterCaseNo=18-T-0604&submit=Search.

303.    BOEM has online access to the public records of the New York State Department of Environmental Conservation ("**NYSDEC**"), including access to the NYSDEC State Superfund

Program under site record at East Hampton Airport (code 152250), available –

https://www.dec.ny.gov/data/DecDocs/152250/; and for site record at Wainscott Sand and

Gravel (code 152254) available at – https://www.dec.ny.gov/data/DecDocs/152254/.

304.     In June 2015, PSEG Long Island LLC, acting for and on behalf of LIPA, sent notice "To

All Interested Proposers[,]" soliciting proposals in the South Fork RFP "to acquire sufficient

local resources to meet expected peak load requirements until at least 2022 in the South Fork of

Long Island, and 2030 for certain areas east of Buell.  Such resources will be located on Long

Island" (see Exhibit P- Notice to Proposers).

305.     The LIPA Memo states, "Deepwater Wind [South Fork Wind] was the only proposal

offering offshore wind technology."

306.     During the South Fork RFP procurement process, South Fork Wind did *not* compete with

other proposals offering offshore wind technology.

307.     If the South Fork RFP were a competitive bidding process, all bidders would have had to

compete equally according to the same objectives and minimum specifications and requirements

according to the RFP.

_Mandatory Criteria_

308.     According to the South Fork RFP and the RFP Evaluation Guide, LIPA should have

disqualified South Fork Wind's offshore wind farm proposal at the outset.

309.     According to the SFRFP Evaluation Guide, "Mandatory Criteria" is used to measure

"Proposals' compliance to the RFP and […] to determine whether the Proposal can be accepted.

If this information is not provided at the Proposal Submittal Deadline, the Proposal will be

eliminated from consideration."

310.     According to the LIPA Memo, LIPA overlooked four instances where the South Fork

Wind Project did not meet mandatory criteria while disqualifying two of the 21 bids for not meeting mandatory criteria.

311.    The RFP Evaluation Guide lists a mandatory criterion, a May 1, 2019, commercial operating date that is a requirement of the RFP.

312.    South Fork Wind proposed December 31, 2022, as the commercial operating date, three and a half years later than the required date, which should have led to the immediate disqualification in the first phase of the procurement process.

313.    The South Fork RFP required proposals to have a pricing mechanism for a delay.

314.    That mechanism, however, only allowed for a one-year delay, May 1, 2020, which makes Deepwater Wind's proposed commercial operating date two and half years later than any delay that could still meet the RFP's requirements.

315.    Mandatory criteria included the RFP requirement that any "[p]roposal must contain the location of any proposed facility requiring construction and/or permitting" by the submittal deadline (of December 2, 2015).

316.    Upon information and belief, South Fork Wind did not have locations for proposed facilities until one and a half years *after* the submittal deadline.

317.    According to the South Fork RFP, a proposal, as a stand-alone solution, could not be conditioned on some other act or omission under LIPA's mandatory criteria.

318.    According to the LIPA Memo, LIPA joined Deepwater Wind's offshore wind project to separate battery storage proposals to make it appear workable.

319.    In other words, LIPA acted to salvage South Fork Wind's fatally flawed proposal by adding two conditional acts – agreements for installing two battery storage projects.

*Minimum Specifications*

320.    The South Fork RFP requested proposals for "local resources" "located on Long Island" to meet "peak load" or peak electrical demand as an alternative to adding new transmission lines.

321.    The RFP mandated that power production resources comply with "Operating Modes" consistent with dispatchable resources that can be turned on or ramped up remotely in response to a "trigger signal."

322.    The RFP required a commercial operating date no later than May 1, 2019, with an alternative date and pricing option for a one-year delay, no later than May 1, 2020.

323.    The RFP required that each proposal "stand alone" in satisfying the RFP's requirements.

324.    Irrespective of the rules governing the South Fork RFP, LIPA selected the South Fork Wind Project despite its many deficiencies (as follows)—

325.    Deficiency #1: The project cannot reliably supply power to satisfy the peak demand for electricity in response to air conditioner usage on the South Fork in the hotter months from June to September.

326.    Deficiency #2: The project is not a "local resource" that is "located on Long Island" but a power generation resource located on the Outer Continental Shelf in the Atlantic Ocean.

327.    Deficiency #3: The project is not an alternative to adding new transmission lines but *is* a new 60-mile-long transmission line.

328.    Deficiency #4: The Project does not defer the need for new transmission lines but instead requires substantial transmission upgrades;

329.    Deficiency #5: The Project cannot be a source of power until at least 2023, with a proposed commercial operating date of December 31, 2022.

330.    Deficiency #6: The Project is not a dispatchable resource capable of functioning in Operating Modes that require power to be turned on in response to a "trigger signal" (because

turbines that depend on the wind cannot be turned on as demand requires).

331.    Deficiency #7: The Project is not a resource designed to meet "performance calculations" that are "no less severe than […] [a] maximum steady wind velocity [of] 130 mph" (offshore wind turbines cease generating power at a wind speed closer to 55 mph).

332.    The South Fork RFP is around ninety-four pages and does *not* mention "wind farm" or "offshore wind" whatsoever.

333.    The RFP refers to power generation resources designed to be located onshore.

334.    The South Fork RFP mentions "fuel" (for fuel-based generation) thirty-six times, "energy storage" twenty times, "photovoltaic" or "solar" three times, and "geothermal" once.

335.    The South Fork RFP was *not* designed as a solicitation for offshore wind power generation resources.

336.    The South Fork Wind Project did *not* comply with all mandatory criteria according to the South Fork RFP and the SFRFP Evaluation Guide.

337.    The South Fork Wind Project did *not* comply with the South Fork RFP's main objectives.

338.    The South Fork Wind Project did *not* comply with applicable specifications and/or requirements according to the South Fork RFP.

339.    The South Fork Wind Project was the only proposal (not to be disqualified) that failed to satisfy the main objectives of the South Fork RFP.

340.    The South Fork RFP had been fixed to shut out competitive bidding from other offshore wind farm developers.

341.    LIPA awarded a power purchase agreement to South Fork Wind for a proposal that failed to meet the minimum specifications and requirements of the South Fork RFP.

342.    During the South Fork RFP procurement process, bidders were not treated equally.

343.    The South Fork RFP procurement was not a level playing field where bidders' proposals competed on the merits by the same rules.

344.    The South Fork RFP process permitted unfair advantage and favoritism.

345.    The South Fork RFP was not a "competitive" bidding process.

346.    According to NEPA, Defendants "shall independently evaluate the information submitted [by South Fork Wind] and shall be responsible for its accuracy." Further, "[i]f the document is prepared by contract, the responsible Federal official shall furnish guidance and participate in the preparation and shall independently evaluate the statement [FEIS] prior to its approval and take responsibility for its scope and contents" (NEPA 1978, 40 CFR § 1506.5).

347.    Despite receiving clear substantive evidence rebutting the presumption of regularity attached to the South Fork RFP, Defendants DOI and BOEM approved the Project without independently evaluating and verifying the South Fork RFP to ensure it was a "technology-neutral competitive bidding process."

_____

_Peak Demand_

348.    According to the LIPA Memo, the Project's purpose as expressed in the South Fork RFP is as follows— "[T]he basic objective of the RFP was to acquire sufficient local resources to meet expected peak load requirements until at least 2022 in the South Fork, and 2030 in the east of Buell area [internal quotes removed][emphasis added]."

349.    BOEM did not identify, discuss, consider, or "specify the underlying purpose and need" identified by LIPA in the South Fork RFP.

350.    BOEM received objective evidence in internal LIPA documents showing that the South Fork Wind Project cannot reliably provide power to meet peak demand.  BOEM uploaded the available documents— www.regulations.gov/comment/BOEM-2020-0066-0385 (see "Motion to

Reopen Record Supp by Kinsella Jan 29 2021" BOEM Index Exhibit #029 and related exhibits).

351.    BOEM received a copy of an internal LIPA report stating that "wind alone has a very

small effective capacity due to the distinct statistical possibility that it may have very low

available power output at the time of a peak-period contingency" (See WESC Report,

"Calculation of Effective Forced Outage Rate of Offshore Wind" BOEM Index Exhibit #035, at

p. 2, last ¶).

352.    BOEM received a copy of an internal LIPA report stating that its "[i]nitial analysis of

temperature/wind correlation in the Block Island data provided by DWW [South Fork Wind]

indicates that such a correlation may exist[,]" referring to a "correlation between high load and

persistent low-wind conditions" (see WESC Report, SF RFP Portfolio Load Cycle Analysis"

BOEM Index Exhibit #034, at p. 3, last paragraph).

353.    BOEM received a copy of an internal LIPA report, stating that, based on data provided

by South Fork Wind, the "offshore wind project at P90 probability level would have a May

through September Peak Period unavailability […] of 29.9% without the assistance of LI Energy

Storage battery [emphasis added]."  The report continues: "Without the [33 MW] battery,

shortfalls occur on 77 of the 152 Peak Period days, or about 50% of the days [emphasis added]."

Moreover, there "are periods of up to 4 consecutive days where Wind+Battery [33 MW]

shortfalls are occurring in August and September [emphasis added]." (See report, South Fork

RFP Deepwater Offshore Wind Proposal EFOR Analysis" BOEM Index Exhibit #036, at pp. 2-

3).

354.    According to data provided by the U.S. Energy Information Administration ("USEIA"),

the actual average generating capacity of the Block Island Wind Farm (over five years from 2017

to 2021) was 23.6% for August, which is less than half the average output (of 50.6%) for the

cooler months of the year (November through to January)(see Exhibit G- BIWF Capacity (2017-2021).

355.    BOEM received that information in an Excel spreadsheet but summarized output data for four years from 2017 to 2020.  The actual average generating capacity of the Block Island Wind Farm (2017-2020) was 27.8% for August, which is around half the average output (of 51.8%) for the cooler months of the year (November through to January).  BOEM uploaded the spreadsheet that is available online at— www.regulations.gov/comment/BOEM-2020-0066-0384 (see "Block Island Wind Farm BIWF Capacity (2017-2020)" BOEM Index Exhibit #182).

356.    BOEM received Testimony based on wind speed data provided by the U.S. National Oceanic and Atmospheric Administration ("**NOAA**") on the correlation between onshore summer-time temperatures and the degree to which a facility that relies on offshore wind for power generation cannot reliably provide power to meet peak demand in response to air conditioner usage, and periods when such a facility may not provide any power at all.  BOEM uploaded the testimony together with supporting documents that are available at— www.regulations.gov/comment/BOEM-2020-0066-0387 (see "18-T-0604 - Testimony Part 2 - Public Interest Price Oct 9, 2020" BOEM Index Exhibit #099).

357.    BOEM received clear substantive evidence that the South Fork Wind Project could not reliably provide power to meet "peak load requirements […] in the South Fork […]."

358.    Defendants DOI and BOEM ignored evidence showing that the Project's "basic objective" was to acquire resources "to meet expected peak load requirements" in the South Fork."

—————————————————————

[left blank]

## VIII.  COASTAL ZONE MANAGEMENT

359.    The U.S. Office of Ocean and Coastal Resources Management is part of the U.S.

National Oceanic and Atmospheric Administration ("NOAA"), an agency of the U.S.

Department of Commerce.

360.    The U.S. Office of Ocean and Coastal Resources Management approved the Town of

East Hampton Local Waterfront Revitalization Program ("LWRP") (in August 2008) pursuant to

the Coastal Zone Management Act ("CZMA") and implementing regulations 15 C.F.R. part 923

(see Exhibit H- CZMA LWRP).

361.    The Town of East Hampton LWRP contains the enforceable policies of the State of New

York's Coastal Zone Management Program applicable to the project's consistency review.

362.    "East Hampton Town has an overwhelming interest in preserving and protecting its water

resources […] Groundwater must be carefully monitored, as pipelines carry water from one end

of the Town […]  Remediation of polluted groundwater and surface waters, restoring damaged

wetlands and terrestrial and marine ecologies […] must be undertaken to avoid even more costly

and complex solutions in the future. […] *Fresh Ponds* […][and] *Coastal Ponds* […] are linked to

both the saltwater/tidal interface and to the underground aquifers, the sole source of drinking

water for the Town." (see Exhibit H- CZMA LWRP, at p. XII-1, PDF p. 554, ¶ 2.)

363.    In 1995, the Town established a Harbor Protection Overlay District ("HPOD") to protect

the surface water bodies in the Town, including Georgica Pond and Wainscott Pond, "by

regulating the most immediate contributing areas surrounding them" (*id*. at p. XII-17, PDF p.

570, ¶ 5).

364.    The Project's construction corridor is upgradient and adjacent for over one thousand feet

(1,000 ft) to the HPOD that, is designed to protect the sensitive environment of Georgica Pond.

_____

_Groundwater Contamination_

365.    The U.S. Office of Ocean and Coastal Resources Management approved the East

Hampton Town LWRP in 2008 before adverse effects on human health and the environment

from PFAS contamination were generally known.  Still, the program states that "hazardous

materials pose direct risks to ground and surface waters and wetlands.  These include […]

chemicals and solvents, both households and commercial, used for […] all manner of natural and

synthetic materials" (*id.* at p. XII-19, PDF p. 572, ¶ 7.)

366.    "On the South Fork, only the upper two aquifers contain fresh-water and, in many areas

of the town, only the Upper Glacial aquifer contains significant quantities of freshwater. […] In

East Hampton, "drinking water supplies are limited to the Upper Glacial and [upper] portions of

the Magothy aquifers.  The deep flow recharge areas are located in the central portion of the

South Fork.  Movement within the aquifers is lateral and vertical." (*id.* at p. XII-43, PDF p. 596,

¶¶ 3-4.)

367.    "The future quality of potable water within the town will be dependant upon the town's

ability to successfully manage this deep flow recharge area and limit the presence of sources of

pollution, including residential and commercial development" (see Exhibit I- Water Resources

Mgt Plan, at p. 21, PDF p. 36, ¶ 3).

368.    "Since the quantity of water is great and the movement slow, this water, if contaminated,

would remain so for decades. Closer to the coastal areas, elevation drops, the lens is thinner and

movement is predominantly lateral.  Freshwater moves toward shallow flow streams and

discharges directly to the ocean and bays across the freshwater-saline interface." (See Exhibit H-

CZMA LWRP, at p. XII-43, PDF p. 596, ¶ 4.)

369.    CZMA Enforceable Policy 38 reads— "The quality and quantity of surface water and

groundwater supplies, will be conserved and protected, particularly where such waters constitute the primary or sole-source of water supply." (*id.* at p. XII-72, PDF p. 625, ¶ 6.)

370.    CZMA Enforceable Policy 38a reads— "Maintain water resources as near to their natural condition of purity as reasonably possible to safeguard public health" (*id.*, ¶ 7).

371.    The LWRP explanation of policies 38 and 38a reads— "Groundwater is the principle source of drinking water in the Town and therefore must be protected.  Since Long Island's groundwater supply has been designated a 'sole source aquifer', all actions must be reviewed relative to their impacts on the Long Island aquifer" (*id.*, ¶ 8).

372.    The Project's approved Coastal Zone Management Consistency Statements ("NY CZM Statement") for New York alleges that "[t]he SFEC is consistent with this policy[,]" referring to Enforceable Policy 38, but remains silent on Policy 38a.

373.    The NY CZM Statement alleges that "the SFEC does not involve the use of groundwater resources and no groundwater resources are anticipated to be impacted" contrary to fact.

374.    The Project's concrete duct banks and vaults will intersect with groundwater at some locations and impact groundwater.

375.    The Project ignores guideline number (8) for CZMA Enforceable Policies 38 and 38a, that "[d]iscourage[s] the siting of commercial or industrial facilities with the potential for ground or surface water pollution" (*id.*, p. XII-73, PDF p. 626).

376.    As described (below), the Project will adversely impact human health and the environment by exacerbating, prolonging, enhancing, and spreading PFAS contamination in soil and groundwater.

---

*Significant Coastal Fish and Wildlife Habitats*

377.    BOEM approved the Project's cable corridor between the locally designated Significant

Coastal Fish and Wildlife Habitats of Wainscott Pond (NYSDEC-classified Freshwater Wetland) and Georgica Pond, which supports brackish wetlands and an abundance of wildlife of which some are endangered or threatened.

378.   The Significant Coastal Fish and Wildlife Habitat of Georgica Pond is described under CZMA Enforceable Policy 7 as follows— "Georgica Pond to function as a marine estuary which provides a spawning ground and nursery area for anadromous fish such as alewives, and maintains salinity for blue claw crab, the most important fishery in the pond.  It provides an essential step in the food chain and is thus important to local fish populations.  White perch as well as many bait fish, such as silversides, spawn in the pond.  The coordination of beach opening with spawning times determines the effectiveness of this system.  The pond also provides feeding areas for osprey (T), winter waterfowl, common terns (T), roseate terns (E, E-FED), least terns (E) and several species of herons and migrating shorebirds.  The barrier beach supports a colony of least terns and several pairs of piping plovers (E, T-FED). […]  Breeding birds also include blue-winged teal, common gallinule and black duck. Recreational uses associated with the wildlife resources at Georgica Pond include crabbing, hunting and birding. Commercial activities include the taking of perch, bait, crabs and eels" (*id.*, p. III-49, PDF p. 202, ¶ 3)

379.   The Significant Coastal Fish and Wildlife Habitat of Wainscott Pond is described within the East Hampton Town LWRP as follows— "Wainscott Pond provides valuable wildlife habitat for waterfowl and aquatic species.  Overwintering ducks include shovelers, blue-winged teal and green-winged teal.  The pond is a stopover for migrating shorebirds and snow geese and a resting area for Canada geese.  Its wetland fringes also support a variety of wildlife.  Breeding birds include black ducks and occasionally ruddy ducks.  The pond also supports populations of

painted and snapping turtles.  Although use of the pond by the public is limited by the lack of public access, it is a popular duck hunting spot" (*id.*, p. III-50, PDF p. 203, ¶ 4)

380.    In 1990, the Town of East Hampton's Assistant Environmental Protection Director issued a report on Wainscott Pond citing "agricultural runoff" as a primary pollutant causing "high BOD [Bio-chemical Oxygen Demand] which stresses fish, reptiles, amphibians and waterfowl. Fish kills from low oxygen levels occur periodically.  Anaerobic conditions exist in lower portions of the water column during the summer months.  Wildlife populations that exist within the pond itself are high density and low diversity which are indicative of poor water conditions. The primary fish populations within the pond are stunted yellow perch, brown bullhead and American eel.  There is a lack of predator species (i.e. warm water competitive species, e.g. largemouth bass, chain pickerel) which require higher oxygen levels.  The perch and bullhead populations are commercially and recreationally useless because of their stunted size.  Problems could be reduced with hedgerow, wetland buffers, and allowing for proper drainage structures."

381.    East Hampton Town LWRP continues: "Any activities that would further degrade water quality […] would have a significant impact on fish and wildlife species inhabiting Wainscott Pond.  All species of fish and wildlife may be affected by pollution from chemical contamination. […]  Wetland areas surrounding the pond should be restored to improve both water quality and wildlife habitat" (id., pp. III-50-51, PDF pp. 203-4).

382.    The freshwater habitat of Wainscott Pond is approximately eight hundred feet (800 ft) to the west of the SFEC construction corridor.

383.    The habitat of Georgica Pond is approximately five hundred feet (500 ft) to the northwest of the corridor (at Wainscott NW Road).

384.    The hydrogeology beneath the SFEC construction corridor route is connected via

groundwater flow to the hydrogeology of Wainscott Pond and Georgica Pond.

385.    South Fork Wind has begun and plans to continue excavation and horizontal directional drilling activities on Beach Lane and Wainscott North West Road (and at other locations) where it will encounter contaminated groundwater.

386.    Groundwater beneath Beach Lane contains high levels of PFAS contamination, such as PFOA contamination detected in a groundwater monitoring well (MW-4A) at 82 parts per trillion, exceeding the 2016 EPA Health Advisory Levels.

387.    Groundwater beneath Wainscott NW Road contains high concentration levels of PFAS contamination, such as PFOS contamination detected in a groundwater monitoring well (MW-15A) at a concentration level of 15 ppt that exceeds the NYS Maximum Contamination Limit.

388.    "Wainscott Pond" is *not* mentioned in the FEIS or ROD.

389.    BOEM did not consider the freshwater habitat of Wainscott Pond.

390.    CZMA Enforceable Policy 44 reads— "Preserve and protect […] freshwater wetlands and preserve the benefits derived from these areas" (id., p. XII-76, PDF p. 629).  It explains that "[a]ll structures and uses […] shall be […] in a location so that no wetland will be diminished in size, polluted, degraded or lost, or placed in peril in order to establish the structure or use"  (id., p. XII-78, PDF p. 631, ¶ (1)).

391.    The Project's concrete duct banks and vaults will pollute, degrade, and place the Wainscott Pond and Georgivca Pond habitats in peril.

392.    According to testimony submitted by South Fork Wind in the NYSPSC proceeding, its underground concrete duct banks and large vaults may prolong PFAS contamination in groundwater via diffusion.

393.    In the instant matter, diffusion occurs where PFAS contaminant mass moves into lower

permeability materials such as concrete, enhancing "the long-term persistence of PFAS in groundwater. For instance, at one site PFAS penetrated 12 cm into a concrete pad at a fire training area, and diffusion was contributing process (Baduel, Paxman, and Mueller 2015)." See Exhibit J- ITRC, PFAS Fate & Transport, Mar 2018 (at p. 6, last ¶).

394. "Back-diffusion: PFAS dissolved in groundwater that accumulated in lower permeability silt/clay layers below the water table may diffuse into the higher permeability zones due to changing relative concentrations" (see Exhibit K- ITRC, PFAS Fate & Transport, Aug 2021 (at PDF p. 5, point 2).

395. The Project's underground concrete duct banks and vaults will run for approximately two miles through an area known for PFAS contamination of soil and groundwater.

396. The concrete duct banks and vaults will act to retain PFAS contaminants in the concrete materials, and via a process of "back-diffusion out of these low permeability materials may result in the longterm persistence of PFAS in groundwater even after source removal and remediation" (*id.*, at PDF p. 9, ¶ 6).

397. At some locations, underground concrete duct banks and vaults have been installed or will be installed where they intersect with groundwater.

398. According to the U.S. Geographic Survey's National Water Information System, groundwater levels vary seasonally (over the short term) and in the long term by up to eight feet (see Exhibit E- 2022 Comments, at pp 10-11, Figs 4-5).

399. Suffolk County Department of Health Services detected PFAS contamination exceeding New York State's Maximum Contamination Level (10 ppt) in more private drinking water wells in Wainscott than anywhere else in Suffolk County, according to a Newsday report. The number of wells in Wainscott with excessive PFAS contamination (65) represents thirty-two percent

(32%) of the total number of contaminated wells in Suffolk County (202).  See Exhibit M- PFAS Data, Suffolk County (Newsday, Apr 2022).

400.    The concrete duct banks and vaults and the disturbed excavation will become a preferential pathway for the movement of PFAS and, as such, will transport PFAS contaminants to locations that otherwise would not be impacted.

401.    "Subsurface features, including utility lines: Preferential pathways may result from subsurface features.  For example, the flow may seep into or out of nonwatertight sewer lines based upon groundwater elevations relative to the utility.  The bedding material of a subsurface line may also convey groundwater."  (See Exhibit L- **ITRC**, PFAS- Site Characterization, Aug 2021 (at p. 5, point 9).

402.    "Surface water bodies in the town include the streams, ponds, tidal creeks, tidal embayments and wetlands.  Ponds and streams that exist near the coastal areas such as Georgica Pond […] are hydraulically connected to the groundwater and owe their existence to the fact that the land surface elevation is below that of the water table." (See East Hampton Town Water Resources Management Plan, dated March 2004, at p. iii, PDF p. 7, ¶ 3).

403.    The Project's adverse environmental impact from installing concrete duct banks and vaults in an area where groundwater contains high levels of PFAS contamination will exacerbate, prolong, and enhance such contamination.

404.    The Project's adverse environmental impact will impact sensitive habitats in proximity to the west and east of the Project's construction corridor through groundwater flow.

---

*Siting of Energy Facilities*

405.    The explanation of LWRP Policy 27 reads: "Siting of any new non-renewable energy facilities in the East Hampton waterfront area should be limited to those necessary to serve the

needs of the residents of East Hampton only.  Due to the environmental sensitivity of the Town, its location at the extreme eastern end of Long Island and the configuration of the peninsula, it would at best be an inefficient utilization of resources to generate non-renewable energy to serve residents of other localities to the west." (East Hampton Town LWRP, p. XI-2, PDF p. 550 ¶ 3).

406.    The transmission facility is *not* designed to meet peak demand for power in the Town of East Hampton (during summer) but provides more energy (during winter) when it is *not* needed in the town.  The excess power will serve residents of other localities to the west, contrary to CZMA Enforceable Policy 27.

407.    CZMA Enforceable Policy 27 continues– "Decisions on the siting and construction of major energy facilities in the coastal area will be based on public energy needs, compatibility of such faclities with the environment, and the facility's need for shorefront location" (*id.*, p. XI-1, PDF p. 549), and explains that a "determination of public need for energy is the first step in the process for siting new facilities."

408.    Policy 27 refers explicitly to transmission lines under Article VII of New York State's Public Service Law that "establishes the basis for determining the compatibility of these facilities with the environment and the necessity for a shorefront location" (*id.*, p. XI-1, PDF p. 549).

409.    As explained in detail in the information provided to BOEM, South Fork Wind "failed to sustain its burden to show a need for its facility[,]" that is defined within the South Fork RFP to serve as "an alternative to adding new transmission lines, […] to acquire sufficient local resources to meet expected peak load requirements until at least 2022 in the South Fork" (see BOEM Exhibit #009, at pp. 10-15).

410.    The project BOEM approved is contrary to CZMA Enforceable Policy 27.

## IX.    RELATED LEGAL CHALLENGES

411.    The New York State Public Service Commission's grant of an Article VII certificate to

South Fork Wind (docket 18-T-0604) is the subject of the following two separate legal

challenges: (a) *Simon V. Kinsella et al. v. NYS Public Service Commission et al.*, N.Y. Supreme

Court, Appellate Div. - 2nd Dept., filed September 9, 2021 (<u>index 006572/2021</u>); and (b)

*Citizens for the Preservation of Wainscott, Inc. et al. v. NYS Public Service Commission et al.*,

N.Y. Supreme Court, Appellate Div. - 2nd Dept., filed September 9, 2021 (<u>index: 006582/2021</u>)

412.    The 2017 PPA is the subject of the following legal challenge on appeal— *Simon V.*

*Kinsella et al. v. Long Island Power Authority, et al*. N.Y. Suffolk County Supreme Court, filed

November 9, 2021 (<u>index: 621109/2021, available here</u>).

## X.    INJUNCTIVE RELIEF ALLEGATIONS

413.    My family and I are suffering an injury that is actual or imminent due to BOEM's

approval of construction that will continue to disturb, exacerbate, and prolong PFAS

contamination of soil and groundwater in our neighborhood.

414.     BOEM has permitted South Fork Wind to proceed with the Project's construction,

exposing my family and me to increased levels of contamination to which we would not

otherwise be exposed.

415.    BOEM permitted South For Wind to proceed with construction irresponsibly without

regard to environmental PFAS contamination.

416.    BOEM  approved the underground installation of concrete duct banks and vaults

encroaching into PFAS-contaminated groundwater.  According to information provided by South

Fork Wind, its underground concrete infrastructure will "enhance the long-term persistence of

PFAS in groundwater." See Exhibit J- ITRC, Environmental Fate and Transport for PFAS,

March 2018 (at p. 6, last ¶).

417.    The concrete duct banks and vaults form a barrier between the primary source of PFAS contamination at the Airport and Georgica Pond, where my family and I used to sail and swim.

418.    South Fork Wind's underground concrete infrastructure will prolong and increase our exposure to PFAS contamination.

419.    BOEM's approved Project will expose my family and me to increased levels of PFAS contamination from the underground concrete infrastructure and excavation, altering the course of contaminant flow via preferential pathways, thereby spreading the contaminant plume to areas of the sole-source aquifer that would otherwise not be impacted by the PFAS contamination.

420.    My family and I already incur costs of $800 each time we have our water tested so that we may monitor any changes in the PFAS contamination plume.

421.    BOEM  approved the underground installation of concrete duct banks and vaults that will impact groundwater used for irrigating local crops by farmers from whom we buy fruit and vegetables daily at the corner farm stand.

422.    Breaking from prior practice, South Fork Wind refuses to disclose PFAS contamination test results of soil and groundwater samples taken earlier this year.

423.    Had BOEM complied with NEPA and undertaken a thorough environmental review, I would not be in a position where I am being denied information that reasonably poses an imminent threat to my physical safety and that of my family.  I have a right to know the extent to which BOEM's approved Project threatens my health when substantive evidence gives cause to believe that contamination poses a significant risk to public health.

424.    As a result of BOEM's action approving the Project, our property is less valuable.

425.    The New York State Public Service Commission ("NYSPSC") did *not* require SFW, and

SFW did not volunteer, to test soil or groundwater from *within* its construction corridor, despite a motion seeking to include such testing.

426.    The NYS Article VII hearing (case 18-T-0604) denied intervenor-parties' rights to examine and cross-examine witnesses on such evidence.

427.    The NYSPSC hearing lasted two years until the evidentiary record closed on December 8, 2020.  On December 23, 2020 – just fifteen days *after* the NYSPSC hearing had concluded, SFW tested soil or groundwater from within its construction corridor for the first time.

428.    By delaying testing for PFAS contamination, SFW avoided environmental review during the NYSPSC proceeding of *any* PFAS contamination test results of soil or groundwater from *within* its construction corridor.

429.    Neither Federal nor State agencies thoroughly reviewed PFAS contamination to secure our health.

430.    I have no option but to look into these matters *before* SFW causes further environmental damage.

431.    Given that PFAS contamination poses a risk to human health, I have no other legal remedy other than to seek injunctive relief to allow time for South Fork Wind to disclose the laboratory results for PFAS contamination of soil or groundwater taken from within or near its onshore SFEC route, including but not limited to supporting documentation such as sampling plans, bore/well locations, maps, and borehole/well logs.  Time is of the essence.

_____

*Treatment Facility for PFAS Contamination*

432.    On January 21, 2021, SFW filed (in the NYSPSC Article VII 18-T-604 proceeding) the following response to a Motion to Reopen the Record that sought to include PFAS contamination

test results of samples taken from within the SFEC construction corridor—

> "[…] SFW is unlikely to encounter any PFAS contamination during construction of
> the SFEC due to the fact that it is not performing <u>any</u> excavation in areas where
> PFAS has been released, […] and also because most of the excavation will take
> place <u>above the water table</u> [emphasis added]" (NYSPSC DMM 254, <u>available at</u>
> <u>dps.ny.gov, click here</u>, at p. 17).

433.   Three months later (in April 2022), SFW excavated and removed soil and groundwater to
install a transition vault at the southern end of Beach Lane, Wainscott.

434.   The bottom of the excavation for the transition vault contained groundwater (see
Appendix 1- PFAS Treatment, at p. 6, marked "F") (also <u>available online, click here</u>).

435.   Contrary to the characterization (in ¶ 432 above), in May 2022, South Fork Wind was
treating PFAS-contaminated groundwater using four frac tanks with a combined capacity of
75,000 gallons and a Granular Activated Carbon filter at a treatment facility in the Town of East
Hampton groundwater (see Appendix 1- PFAS Treatment, at pp. 1-4).

436.   BOEM's action has already caused substantial irreparable injury because of the concrete
duct banks and vaults that South Fork Wind has installed.  Leaving them where they are will
permanently exacerbate and prolong the environmental harm.  There is a substantial chance that
upon the final resolution of the action, I cannot return to the position I previously occupied.

437.   Both the balance of the equities and the public interest favor injunctive relief.
Safeguarding a community's water supply from contamination by dangerous chemicals and
ensuring that Defendants comply with the law serve my interests and the public interest.  They
outweigh any harm that might result from a preliminary injunction.

438.   BOEM's arbitrary exercise of power contrary to law permitted South Fork Wind to cause

injury to me, my family, and our property.

439.    Constitutional, statutory, and regulatory limitations imposed by law upon BOEM's action

to approve the Project are essential to preserving my private rights of life, liberty, property, and

due process of law.

440.    I seek to enforce these limitations by judicial process as a means of protecting my rights

"against the power of numbers, and against the violence of public agents transcending the limits

of lawful authority, even when acting in the name and wielding the force of the government.''

See *Hurtado v. California*, 110 U.S. 516, 528, 532, 536 (1884).

# XI.    FIRST CLAIM FOR RELIEF

## Failure to include adverse environmental impacts

### (Against all Defendants for violations of NEPA and the APA)

441.    I reallege Paragraphs 1–440 (above) as if set forth in full herein.

442.    According to NEPA, 42 U.S.C. § 4332(2)(C), and its implementing regulations, an EIS

must provide a full and fair discussion of significant "environmental impacts" and "any adverse

environmental effects which cannot be avoided" to inform decisionmakers and the public of the

reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of

the human environment.  In the EIS, it must be evident the agency took a "hard look" at the

environmental consequences of its decision.

443.    As described (above), Defendants buried deep within its FEIS an ambiguous reference to

"perfluorinated compounds" (on page 655 of 1,317).

444.    Defendants failed to identify the harmful contaminants, disclose their location relative to

the Project, consider their impacts, or discuss PFAS contamination that they knew posed a threat

to human health and the environment.

445.    Defendants failed to address the imminent risks of the Project causing, exacerbating, prolonging, or otherwise furthering harmful PFAS contamination in the Town of East Hampton's drinking water supply or impacting the nearby downgradient habitats and surface waters of Georgica Pond and Wainscott Pond.

446.    Defendants failed to take a "hard look" into environmental contamination "to the fullest extent possible" in accordance with Congress' express direction that it does so pursuant to NEPA (42 U.S.C. 4321 *et seq.*) and its implementing regulations.

447.    In approving a Project that relied on a deficient FEIS, Defendants failed to comply with NEPA and its implementing regulations and therefore engaged in final agency action that was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law.

448.    According to the APA, 5 U.S.C. § 706(2)(A), the Court has the authority and duty to hold unlawful and set aside such agency action in the relevant part.

449.    I am entitled to a judgment, so holding and setting aside.

450.    Further, I am entitled to preliminary and permanent injunctions against any further work permitted or otherwise pursuant to such unlawful final agency action.

451.    Furthermore, I am entitled to seek an order compelling South Fork Wind to dismantle, remove, and remediate any damage and return the SFEC corridor to its original condition, including but not limited to removing all concrete duct banks and vaults and all and any other infrastructure and equipment related to the Project.

## XII.   SECOND CLAIM FOR RELIEF
### Failure to assume responsibility for environmental analyses
(Against all Defendant for violations of NEPA and the APA)

452.    I reallege Paragraphs 1–440 (above) as if set forth in full herein.

453.    The "U.S. Environmental Protection Agency" ("EPA") was a cooperating agency "during the development and review" of the FEIS (ROD at p. 1, PDF p. 3, ¶ 2).

454.    According to NEPA (42 U.S.C. 4321 *et seq.*) implementing regulation § 1501.6 (b), cooperating agencies shall participate in the scoping process and "[a]ssume on request of the lead agency responsibility for developing information and preparing environmental analyses including portions of the environmental impact statement concerning which the cooperating agency has special expertise."

455.    On October 18, 2021, EPA Administrator Michael S. Regan announced the agency's PFAS Strategic Roadmap—laying out a whole-of-agency approach to addressing PFAS.

456.    On June 15, 2022, the EPA published four new lifetime health advisories for specific PFAS contaminants in drinking water as part of the President's plan to combat PFAS pollution and the Environmental Protection Agency's PFAS Roadmap.  These health advisories reflect the Administration's commitment to following the science and up-to-date public health information.  Specifically, the EPA is releasing interim updated drinking water lifetime health advisories for perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS"), replacing those issued by EPA in 2016.  The updated advisory levels are based on new science that indicates that some negative health effects may occur with concentrations of PFOA or PFOS in water that are near zero.

457.    The EPA has "special expertise" in the field of environmental contamination, including PFAS contamination.

458.    The EPA had detailed knowledge of the nature and extent of PFAS contamination in Wainscott, and South Fork Wind's "proposed construction activities [that] would disturb

approximately 10,000 tons short (US) of soil and undoubtedly impact the contamination site"
(see Exhibit N- EPA Letter & Resp, PFAS & SFW).

459.    BOEM "shall […][u]se the environmental analysis and proposals of cooperating agencies
with […] special expertise, to the maximum extent possible consistent with its responsibility as
lead agency" (40 C.F.R. § 1501.6(a)).

460.    Contrary to substantive evidence of PFAS contamination, BOEM approved the FEIS,
concluding that— "Overall, existing groundwater quality in the analysis area appears to be good"
(at p. H-23, PDF p. 655, ¶ 2).

461.    BOEM suppressed information on PFAS contamination provided by the EPA in violation
of 40 C.F.R. § 1501.6(a)(2).

462.    The EPA failed to assume responsibility for developing and preparing environmental
analyses concerning information already in its possession in violation of 40 C.F.R. § 1501.6(b).

463.    BOEM as the lead agency and the EPA as a cooperating agency developed a FEIS that
ignored critical information with which they had been provided concerning environmental
contamination that poses a risk to human health and the environment.

464.    Defendants failed to comply with NEPA and its implementing regulations and are
responsible for a final agency action that was arbitrary, capricious, an abuse of discretion, and
otherwise not in accordance with the law.

465.    According to the APA, 5 U.S.C. § 706(2)(A), the Court has the authority and duty to hold
unlawful and set aside such agency action in the relevant part.

466.    I am entitled to a judgment, so holding and setting aside.

467.    Further, I am entitled to preliminary and permanent injunctions against any further work
permitted by or otherwise pursuant to such unlawful contributing acts to final agency action.

468.     Furthermore, I am entitled to seek an order compelling South Fork Wind to dismantle,

remove, and remediate any damage and return the SFEC corridor to its original condition,

including but not limited to removing all concrete duct banks and vaults and all and any other

infrastructure and equipment related to the Project.

## XIII.  THIRD CLAIM FOR RELIEF

### Failure to evaluate and verify information

(Against Defendants DOI and BOEM for violations of NEPA and the APA)

469.     I reallege Paragraphs 1–440 (above) as if set forth in full herein.

470.     According to NEPA (42 U.S.C. 4321 et seq.), implementing regulation § 1506.5(a), when

"an agency requires an applicant to submit environmental information for possible use by the

agency in preparing an environmental impact statement, […] [t]he agency shall independently

evaluate the information submitted and shall be responsible for its accuracy."  The section

continues— "It is the intent of this paragraph that acceptable work not be redone, but that it be

verified by the agency."  Regulation § 1506.5(c) reads: "If the document is prepared by contract,

the responsible Federal official shall furnish guidance and participate in the preparation and shall

independently evaluate the statement prior to its approval and take responsibility for its scope

and contents."

471.     "BOEM prepared the FEIS with the assistance of a third-party contractor, SWCA, Inc."

(ROD, at p. 1, PDF p. 3, ¶ 2).

472.     BOEM failed to independently evaluate and verify information it received from the

applicant, South Fork Wind, and is responsible for its contents.

473.     If BOEM had independently verified its purpose and needs statement against the

information it received nine months *before* issuing its ROD, or readily accessible public records,

BOEM's purposes and needs would have been proven false.  Instead, BOEM ignores comments it received and relies on fraudulent purposes and needs to support the Project.

474.    BOEM's purpose and needs statement alleges that the "purpose of the Project is to develop a commercial-scale offshore wind facility" (FEIS, at p. ii, PDF p. 6, ¶ 5).

475.    According to the New York State Energy Research and Development Authority, the South Fork Wind Farm does *not* have a commercial capacity large enough to achieve economic advantages of scale, a fact admitted to by the ultimate owners of the Project, Ørsted and Eversource.

476.    BOEM's purpose and needs statement alleges that the Project "is designed to contribute to New York's renewable energy requirements, particularly, the state's goal of generating 9,000 megawatts of offshore wind energy by 2030" (FEIS at p. ii, PDF 6, ¶ 5), referring to the New York's 2019 CLCPA, even though South Fork Wind designed the Project three-and-half-years *before* the law's enactment; and, supposing *arguendo* the law did apply (it does not apply), would have failed to satisfy the law's requirements.

477.    BOEM's purpose and needs statement alleges that the underlying "power purchase agreement executed in 2017" between LIPA and South Fork Wind resulted from a "technology-neutral competitive bidding process" (FEIS, at p. ii, PDF p. 6, ¶ 5) in reference to the South Fork RFP (that is *sine qua non* to the Project's real purpose), which was *not* a "technology-neutral competitive bidding process."

478.    BOEM's purpose and needs statement alleges that its "action is needed to further the United States' policy to make OCS energy resources available for […] development, subject to environmental safeguards[,] [in a manner which is consistent with the maintenance of competition] (43 U.S.C. § 1332 (3)), including consideration of natural resources" (FEIS, at p. ii,

PDF p. 6, ¶ 6) that is contrary to substantive evidence showing that the Project: (i) poses a risk to human health and ignores environment safeguards such as excavating over 30,000 tons of material from a highly contaminated area; and (ii) was born from a rigged procurement process specifically designed to thwart competition.

479.    Defendants DOI and BOEM violated NEPA (42 U.S.C. 4321 et seq.), implementing regulation § 1506.5 by failing to independently evaluate or verify critical information in the FEIS on the Project's purpose and need, and engaged in final agency action that was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law.

480.    According to the APA, 5 U.S.C. § 706(2)(A), the Court has the authority and duty to hold unlawful and set aside such agency action in the relevant part.

481.    I am entitled to a judgment, so holding and setting aside.

482.    Further, I am entitled to preliminary and permanent injunctions against any further work permitted by or otherwise pursuant to such unlawful final agency action.

483.    Furthermore, I am entitled to seek an order compelling South Fork Wind to dismantle, remove, and remediate any damage and return the SFEC corridor to its original condition, including but not limited to removing all concrete duct banks and vaults and all and any other infrastructure and equipment related to the Project.

## XIV.  FOURTH CLAIM FOR RELIEF

### Failure to verify NYS concurrence with Federal Consistency Certification
(Against Defendants DOI and BOEM for violations of NEPA, CZMA, and the APA)

484.    I reallege Paragraphs 1–440  (above) as if set forth in full herein.

485.    I reallege Paragraphs 470 (above) as if set forth in full herein.

486.    The freshwater habitat of Wainscott Pond is approximately eight hundred feet (800 ft) to

the west of the SFEC construction corridor, and the habitat of Georgica Pond is about five

hundred feet (500 ft) to the northwest of the corridor (at Wainscott NW Road).

487.    The hydrogeology beneath the SFEC construction corridor route is interconnected via

groundwater flow to the hydrogeology of Wainscott Pond and Georgica Pond.

488.    South Fork Wind has begun and plans to continue excavation and horizontal directional

drilling activities on Beach Lane and Wainscott North West Road (and at other locations) where

it will encounter groundwater.

489.    Groundwater beneath Beach Lane contains high levels of PFAS contamination, such as

PFOA contamination detected in a groundwater monitoring well (MW-4A) at 82 ppt, exceeding

the 2016 EPA Health Advisory Levels.

490.    Groundwater beneath Wainscott NW Road contains high concentration levels of PFAS

contamination, such as PFOS contamination detected in a groundwater monitoring well (MW-

15A) at 15 ppt that exceeds the NYS Maximum Contamination Limit.

491.    "Wainscott Pond" is *not* mentioned in the FEIS or ROD.

492.    BOEM did *not* consider the freshwater habitat of Wainscott Pond.

493.    The Project's environmental impact from underground concrete duct banks and vaults in

an area where groundwater contains high levels of PFAS contamination will exacerbate, prolong,

and enhance the contamination.

494.    The Project's environmental impact on PFAS contamination will adversely impact

sensitive habitats in proximity to the west (Wainscott Pond) and east (Georgica Pond) of the

Project's construction corridor through groundwater flow.

495.    Contrary to CZMA Enforceable Policy 44, BOEM permitted South Fork Wind to install

concrete duct banks and vaults and undertake excavation and horizontal directional drilling

activities that will pollute, degrade, and place the habits of Wainscott Pond and Georgivca Pond in peril.

496.    Contrary to CZMA Enforceable Policy 27, BOEM permitted South Fork Wind to site its renewable energy project in the Town of East Hampton's Coastal Management Zone.

497.    The Project is *not* designed to serve residents' needs for power during peak demand during the summer but will provide more energy during the winter when the Town does *not* need it.  The Project will serve residents of other localities to the west.

498.    Contrary to CZMA Enforceable Policy 38 and 38a, which require the protection of surface water and groundwater supplies, "particularly where such waters constitute the primary or sole-source of water supply" and to maintain their "purity […] to safeguard public health[,]" BOEM permitted South Fork Wind to begin onshore construction of a high-voltage transmission system and underground infrastructure through a square mile with more PFAS-contaminated drinking water wells than at any other location in Suffolk County.

499.    According to the Coastal Zone Management Act ("CZMA"), the State of New York Department of State ("NYDOS") "shall also consult with the Federal agency responsible for approving the federal license or permit to ensure that proposed conditions satisfy federal as well as management program requirements" (15 C.F.R. § 930.62(d)).

500.    BOEM failed to ensure that the Project satisfied federal and CZMA enforceable policies in violation of 15 C.F.R. § 930.62(d).

501.    BOEM failed to independently evaluate and verify federal and CZMA policies according to NEPA (42 U.S.C. 4321 *et seq.*) implementing regulation § 1506.5(a) and (c).


## XV.   FIFTH CLAIM FOR RELIEF
### Failure to specify an underlying purpose or need

(Against Defendants BOEM and DOI for violations of NEPA and the APA)

502.    I reallege Paragraphs 1–440 (above) as if set forth in full herein.

503.    According to NEPA (42 U.S.C. 4321 *et seq.*) and implementing regulation § 1502.13, the FEIS shall "specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action."

504.    BOEM alleges that the Project satisfies five purposes and needs, but after careful examination, none meet the requirements of § 1502.13.

505.    I reallege Paragraph 474-475 (above) as if set forth in full herein.

506.    Defendants BOEM and DOI alleged purpose of the Project, "to develop a commercial-scale offshore wind energy facility" (FEIS, at p. ii, PDF p. 6, ¶ 5), is contrary to fact and violates 40 C.F.R. § 1502.13 in that the stated purpose does not include the proposed action.

507.    I reallege Paragraph 476 (above) as if set forth in full herein.

508.    Defendants BOEM and DOI alleged purpose that "[t]he Project will contribute to New York's [2019 CLCPA] renewable energy […] goal of 9,000 MW of offshore wind energy" is contrary to fact and violates 40 C.F.R. § 1502.13 in that the stated purpose does not include the proposed action.

509.    Defendants BOEM and DOI allege that "South Fork Wind's goal […] to fulfill its contractual commitments" (FEIS, at p. ii, PDF p. 6, ¶ 5) but do not specify *any* contractual commitments without which BOEM cannot measure and assess alternatives against (undefined) purposes and needs in violation of the requirements of 40 C.F.R. § 1502.13.

510.    I reallege Paragraph 477 (above) as if set forth in full herein.

511.    Defendants BOEM and DOI allege that the 2017 PPA resulted from a "technology-neutral competitive bidding process" (FEIS, at p. ii, PDF p. 6, ¶ 5) is contrary to clear substantial

evidence received by BOEM and violates 40 C.F.R. § 1502.13 in that the stated purpose does not include the proposed action.

512.    Defendants BOEM and DOI assert that "[t]he purpose of BOEM's action is to respond to and determine whether to approve, approve with modifications, or disapprove the COP" (FEIS, at p. ii, PDF p. 6, ¶ 6).  Under such criteria, any plausible set of facts conceived would support an alternative that would be approved, modified, or disapproved, thereby making it impossible to assess and respond to alternatives where no matter what alternative was proposed, they would *all* satisfy BOEM's purpose.  A purpose that denies an agency the opportunity to assess and respond in proposing alternatives violates 40 C.F.R. § 1502.13.

513.    I reallege Paragraph 478 (above) as if set forth in full herein.

514.    Defendants BOEM and DOI allege that its "action is […] subject to environmental safeguards[,] [in a manner which is consistent with the maintenance of competition] (43 U.S.C. § 1332 (3))," (FEIS, at p. ii, PDF p. 6, ¶ 6), but the Project has *not* been subject to safeguards that protect human health and the environment from PFAS contamination and resulted from a non-competitive procurement process contrary to the maintenance of competition.  The allegation is contrary to fact and violates 40 C.F.R. § 1502.13 because the stated purpose does not include the proposed action.

515.    In approving the Project that relied on a deficient FEIS, Defendants BOEM and DOI violated NEPA (42 U.S.C. 4321 *et seq.*) and implementing regulation § 1502.13, and therefore engaged in final agency action that was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

516.    According to the APA, 5 U.S.C. § 706(2)(A), the Court has the authority and duty to hold unlawful and set aside such agency action in the relevant part.

517.    I am entitled to a judgment, so holding and setting aside.

518.    Further, I am entitled to preliminary and permanent injunctions against any further work

permitted or otherwise pursuant to such unlawful final agency action.

519.    Furthermore, I am entitled to seek an order compelling South Fork Wind to dismantle,

remove, and remediate any damage and return the SFEC corridor to its original condition,

including but not limited to removing all concrete duct banks and vaults and all and any other

infrastructure and equipment related to the Project.

## XVI.  SIXTH CLAIM FOR RELIEF

### Failure to consider alternatives

(Against Defendants BOEM and DOI for violations of NEPA and the APA)

520.    I reallege Paragraphs 1–440 (above) as if set forth in full herein.

521.    Defendants BOEM and DOI neither acknowledged nor considered the alternative to

South Fork Wind that would combine it with Sunrise Wind.

522.    Defendants BOEM and DOI failed to "[r]igorously explore and objectively evaluate all

reasonable alternatives" in violation of 40 C.F.R. § 1502.14(a).

523.    Defendants BOEM and DOI failed to "[d]evote substantial treatment to each alternative

considered" in violation of 40 C.F.R. § 1502.14(b), whereas others considered the Sunrise

Alternative, BOEM did not.

524.    Defendants BOEM and DOI failed to "[i]nclude reasonable alternatives not within the

jurisdiction of the lead agency" in violation of 40 C.F.R. § 1502.14(c).

525.     In approving the Project, Defendants BOEM and DOI violated 40 C.F.R. § 1502.14.

526.    In approving the Project that relied on a deficient FEIS, Defendants DOI and BOEM

failed to comply with NEPA (42 U.S.C. 4321 *et seq.*) and implementing regulations and

therefore engaged in final agency action that was arbitrary, capricious, and an abuse of

discretion, and otherwise not in accordance with the law.

527.    According to the APA, 5 U.S.C. § 706(2)(A), the Court has the authority and duty to hold unlawful and set aside such agency action in the relevant part.

528.    I am entitled to a judgment, so holding and setting aside.

529.    Further, I am entitled to preliminary and permanent injunctions against any further work permitted or otherwise pursuant to such unlawful final agency action.

530.    Furthermore, I am entitled to seek an order compelling South Fork Wind to dismantle, remove, and remediate any damage and return the SFEC corridor to its original condition, including but not limited to removing all concrete duct banks and vaults and all and any other infrastructure and equipment related to the Project.

## XVII. SEVENTH CLAIM FOR RELIEF

### The Project was not subject to safety and environmental safeguards
#### (Against Defendants DOI and BOEM for violations of OCSLA and the APA)

531.    I reallege Paragraphs 1–440 (above) as if set forth in full herein.

532.    According to the OSCLA, the Defendant Secretary of the Interior "shall ensure that any activity under this subsection [granting of leases, easements, or rights-of-way for energy and related purposes] is carried out in a manner that provides for […] safety […][and] protection of the environment" (43 U.S.C. § 1337(p)(4)(A) and (B)).

533.    Defendants DOI and BOEM did not ensure that the Project provided for the safety of human health or protection of the environment from adverse impacts related to PFAS contamination.

534.    The FEIS merely refers to a "fourth site" where sampling has "indicated the presence of perfluorinated compounds" without admitting to the name of the compounds, their

concentrations, the nature, extent, or relative proximity of such indicative compounds to the Project's planned excavation and underground construction activity.

535.    Only at the "fourth site" does the FEIS acknowledge the presence of compounds and only site-related compounds.

536.    "Site-related compounds" can include *any* compound related to a site, whether a harmful contaminant or safe naturally occurring compounds such as calcium or sodium.

537.    Defendants DOI and BOEM failed to acknowledge PFAS contamination *within* its construction corridor.

538.    Defendants DOI and BOEM failed to proffer *any* discussion concerning the adverse human health and environmental impacts of excavating over 30,000 tons of material from an area containing PFAS contamination exceeding the 2016 EPA Health Advisory Level.

539.    The area Defendant BOEM approved for the excavation of material, including soil and groundwater, is the same square mile, containing more contaminated drinking water wells than anywhere else on Long Island.

540.    Defendants DOI and BOEM failed to address the potential for the Project it approved to adversely impact downgradient habitats by spreading, altering the course of, exacerbating, prolonging, or intensifying existing PFAS contamination.

541.    By approving the Project, Defendant DOI and BOEM violated 43 U.S.C. § 1337(p)(4).

542.    In granting approvals based on a deficient FEIS, Defendants DOI and BOEM failed to comply with the OCSLA and, therefore, engaged in final agency action that was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law.

543.    According to the APA, 5 U.S.C. § 706(2)(A), the Court has the authority and duty to hold unlawful and set aside such agency action in the relevant part.

544.   I am entitled to a judgment, so holding and setting aside.

545.   Further, I am entitled to preliminary and permanent injunctions against any further work permitted or otherwise pursuant to such unlawful final agency action.

546.   Furthermore, I am entitled to seek an order compelling South Fork Wind to dismantle, remove, and remediate any damage and return the SFEC corridor to its original condition, including but not limited to removing all concrete duct banks and vaults and all and any other infrastructure and equipment related to the Project.

## XVIII.  EIGHTH CLAIM FOR RELIEF
### The Project is not subject to environmental safeguards
(Against Defendants DOI and BOEM for violations of OCSLA and the APA)

547.   I reallege Paragraphs 1–440 (above) as if set forth in full herein.

548.   Congress declared it "to be the policy of the United States that— […] the outer Continental Shelf […] should be made available for […] development, subject to environmental safeguards […][emphasis added]" (43 U.S. Code § 1332(3)).

549.   "The term development means those activities which take place […], including geophysical activity, drilling, […], and operation of all onshore support facilities, […]. (43 U.S. Code § 1331(l)).

550.   I reallege Paragraphs 533-540 (above) as if set forth in full herein.

551.   Defendants DOI and BOEM did not meet their statutory obligations to ensure the Project's development would be subject to proper environmental safeguards that protect human health and the environment regarding PFAS contamination in violation of 43 U.S. Code § 1332(3).

552.   Defendants did *not* ensure the Project's development was subject to proper environmental

safeguards that exposed construction works and residents to PFAS contamination in violation of 43 U.S. Code § 1332(3).

553.    In granting approvals based on a deficient FEIS, Defendants DOI and BOEM failed to comply with OCSLA and, therefore, engaged in final agency action that was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law.

554.    According to the APA, 5 U.S.C. § 706(2)(A), the Court has the authority and duty to hold unlawful and set aside such agency action in the relevant part.

555.    I am entitled to a judgment, so holding and setting aside.

556.    Further, I am entitled to preliminary and permanent injunctions against any further work permitted or otherwise pursuant to such unlawful final agency action.

557.    Furthermore, I am entitled to seek an order compelling South Fork Wind to dismantle, remove, and remediate any damage and return the SFEC corridor to its original condition, including but not limited to removing all concrete duct banks and vaults and all and any other infrastructure and equipment related to the Project.

## XIX.   NINTH CLAIM FOR RELIEF

### Inconsistent with the maintenance of competition

(Against Defendants DOI and BOEM for violations of OCSLA and the APA)

558.    I reallege Paragraphs 1–440 (above) as if set forth in full herein.

559.    Congress declared it "to be the policy of the United States that— […] the outer Continental Shelf […] should be made available for […] development, […] in a manner which is consistent with the maintenance of competition […][emphasis added]" (43 U.S. Code § 1332(3)).

560.    Defendants DOI and BOEM received clear substantive evidence contrary to their

assertions that the 2017 PPA resulted from a "technology-neutral competitive bidding process."

561.    Defendants DOI and BOEM failed to take a "hard look" into the non-competitive nature of the South Fork RFP, under which proposals were advanced based on their technology.

562.    Defendants DOI and BOEM merely parroted the Applicant, blindly relying on its information without ensuring the Project was consistent with the maintenance of competition.

563.    The Project resulted from a non-competitive procurement process that advanced proposals based on their technology in violation of "a manner which is consistent with the maintenance of competition [...]" (43 U.S. Code § 1332(3)).

564.    Defendants BOEM and DOI approved the Project at inflated rates despite receiving clear substantive evidence that the Project resulted from a technology-dependant, non-competitive procurement outside the operations of a competitive market in violation of 43 U.S. Code § 1332(3).

565.    In approving the Project, Defendants DOI and BOEM maintain a monopoly on the energy supply where the utility controls and sets the price of a contract awarded from a non-competitive procurement outside the scope of *any* Federal or State regulatory oversight in violation of 43 U.S. Code § 1332(3).

566.    In granting approvals reliant upon a deficient FEIS, Defendants DOI and BOEM failed to comply with OCSLA and, therefore, engaged in final agency action that was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law.

567.    According to the APA, 5 U.S.C. § 706(2)(A), the Court has the authority and duty to hold unlawful revoke or set aside such agency action in relevant part.

568.    I am entitled to a judgment, so holding and setting aside.

569.    Further, I am entitled to preliminary and permanent injunctions against any further work

permitted or otherwise pursuant to such unlawful final agency action.

570.    Furthermore, I am entitled to seek an order compelling South Fork Wind to dismantle, remove, and remediate any damage and return the SFEC corridor to its original condition, including but not limited to removing all concrete duct banks and vaults and all and any other infrastructure and equipment related to the Project.

## XX.    TENTH CLAIM FOR RELIEF

### Contrary to the Executive Order on Environmental Justice

(Against Defendants DOI and BOEM for violations of Executive Order 12898)

571.    I reallege Paragraphs 1–440 (above) as if set forth in full herein.

572.    Executive Order 12898 requires that "each Federal agency shall make achieving environmental justice part of its mission […]."

573.    Comprehensive Presidential Documents No. 279 (February 11, 1994), identifies ways to consider environmental justice under NEPA, including— "Review of NEPA compliance […] must ensure that the lead agency preparing NEPA analyses and documentation has appropriately analyzed environmental effects on minority populations, low-income populations, or Indian tribes, including human health, social, and economic effects."

574.    The Project approved by Defendants BOEM and DIO violates Executive Order 12898– Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations.

575.    According to the APA, 5 U.S.C. § 706(2)(A), the Court has the authority and duty to hold unlawful revoke or set aside such agency action in relevant part.

576.    I am entitled to a judgment, so holding and setting aside.

577.    Further, I am entitled to preliminary and permanent injunctions against any further work

permitted or otherwise pursuant to such unlawful final agency action.

## XXI.   ELEVENTH CLAIM FOR RELIEF

### Contrary to U.S. Constitutional right to due process

(Against Defendants DOI and BOEM for violations of U.S. Constitution)

578.    I reallege Paragraphs 1–440 (above) as if set forth in full herein.

579.    Defendants DOI and BOEM failed to acknowledge existing PFAS contamination *within* its construction corridor.

580.    Defendants DOI and BOEM failed to consider and ensure that the Project it approved avoided a square mile with more private drinking water wells containing detectible levels of harmful PFAS contaminants than anywhere else on Long Island.

581.    PFAS contamination in the area where South Fork Wind continues to excavate soil and groundwater poses a risk to human health and the environment.

582.    The New York State Public Service Commission ("**NYSPSC**") did *not* require SFW, and SFW did not volunteer, to test soil or groundwater from *within* its construction corridor during the proceeding despite motions seeking to include such testing in the (narrowly-limited) review.

583.    The NYSPSC deprived intervenor-parties' including me, of our rights to examine and cross-examine witnesses on evidence related to PFAS contamination *within* the construction corridor.

584.    The NYSPSC deprived intervenor-parties' including me, of our rights to examine and cross-examine witnesses on the South Fork RFP and the 2017 PPA that it then relied on to support the basis of need for the Project.

585.    The NYSPSC deprived intervenor-parties' including me, of our rights to examine and cross-examine new evidence disclosed soon after the NYSPSC proceeding had concluded.  Such

evidence included South Fork Wind's testing for PFAS contamination within its corridor and information provided by LIPA showing that the South Fork RFP was *not* a "technology-neutral competitive bidding process" (ROD at p. 7, PDF p. 9, ¶ 7).

586.   The NYSPSC admitted under cross-examination that it had *not* considered the cost of energy from the Project to be borne by ratepayers.

587.   Defendants DOI and BOEM failed to consider the same information that the NYSPSC did not consider (see ¶¶ 582-586 above).

588.   Defendants DOI and BOEM received substantive evidence showing that the project's purposes and needs are false but ignored such evidence.

589.   No Federal or State government agency acted responsibly or transparently concerning my and my family's health, safety, and the environment we used to enjoy.

590.   Federal and State administrative fiat has taken the place of fact.

591.   Federal and State administrative proceedings relied on demonstrably false presumptions despite receiving clear substantive evidence sufficient to sustain the burden of rebutting those presumptions.

592.   I have no option but to look into these matters myself before the Project approved by Defendants DIO and BOEM damages my and my family's health and causes further environmental damage.

593.   PFAS contamination poses a risk to human health, so I have no other legal remedy.

594.   Defendants DOI and BOEMI have denied me of right to due process of law guaranteed by the Fourteenth Amendment of the U.S. Constitution.

595.   Defendants DOI and BOEM approved the Project involving my life, liberty, and property; they acted arbitrarily and denied me a fair opportunity to examine, cross-examine

witnesses, and present facts pertinent to my case against the unlawful Project.

596.   Defendants DOI and BOEM violated my Fourteenth Amendments Rights guaranteed under the U.S. Constitution.

## XXII.  TWELFTH CLAIM FOR RELIEF

### Failure to comply with NEPA & FOIA time limits

(Against Defendants DOI and BOEM for violations of NEPA and FOIA)

597.   I reallege Paragraphs 1–440 (above) as if set forth in full herein.

598.   Defendants DOI and BOEM "must" ensure that a determination is made of whether to provide expedited processing of FOIA Request DOI-BOEM-2022-004796 (see Exhibit O- FOIA Request) pursuant to the Freedom of Information Act ("FOIA") and give notice of such determination, "within 10 days after the date of the request" (5 U.S.C. § 552(a)(6)(E)(ii)(I)).

599.   Defendants DOI and BOEM failed to provide notice of their determination of whether to provide expedited processing of the aforementioned request made on July 6, 2022, in violation of 5 U.S.C. § 552.

600.   "Any person making a request to any agency for records under paragraph (1), (2), or (3) of this subsection [5 U.S.C. § 552 (a)] shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions of this paragraph."

601.   "[F]ailure by an agency to respond in a timely manner to such a request shall be subject to judicial review" (5 U.S.C. § 552 (a)(6)(E)(iii)).

602.   According to NEPA, Defendants DOI and BOEM must disclose "to the public as provided by [FOIA] section 552 of title 5" information related to "comments and views" of a Federal agency that is "authorized to develop and enforce environmental standards" such as the

EPA (NEPA, 42 U.S. Code § 4332(2)(C)).

603.   Defendants DOI and BOEM violated NEPA, 42 U.S.C. § 4332(2), and also FOIA, 5

U.S.C. § 552.

## XXIII.     NO PRIOR APPLICATIONS

604.   No prior application for this or any similar relief has been made in this Court.

## XXIV.     PRAYER FOR RELIEF

605.   Wherefore, Plaintiffs pray for relief as follows:

   a.   a preliminary injunction against such work;

   b.   a permanent injunction against such work;

   c.   a declaratory judgment holding that the final agency action approving the Project's

        Construction and Operations Plan was unlawful and set aside in relevant part the final

        agency action challenged herein;

   d.   in due course, an order seeking that whatever part of the onshore facility the

        Applicant has constructed, the Applicant dismantle that part of the Project and

        remediate the site under the oversight of Federal authorities.

   e.   costs of suit herein; and

   f.   such other relief as the Court deems just and proper.

STATE OF NEW YORK

COUNTY OF SUFFOLK

Simon V. Kinsella, being duly sworn, says under penalty of perjury:

I am a resident of Wainscott, Town of East Hampton, State of New York.  The contents of my Complaint, dated July 20, 2022, are true to the best of my knowledge, information, and belief.

Simon V. Kinsella

Sworn to before me this
20th day of July 2022

Notary Public

DAVID FINK
Notary Public, State of New York
No. 4626132
Qualified in New York County
Commission Expires Feburary 28, 2023